*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION: 2000 FED App. 0188P (6th Cir.)
File Name: 00a0188p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

BERTHA BOYD,
  *Plaintiff-Appellee,*

   *v.*

MATTHEW BAEPPLER; DAVID
WILSMAN,
  *Defendants-Appellants.*



No. 99-3234

Appeal from the United States District Court
for the Northern District of Ohio at Cleveland.
No. 98-00047—Paul R. Matia, Chief District Judge.

Argued: February 4, 2000

Decided and Filed: June 6, 2000

Before: WELLFORD, BATCHELDER, and
DAUGHTREY, Circuit Judges.

---

### COUNSEL

**ARGUED:** Thomas J. Kaiser, CITY OF CLEVELAND
LAW DEPARTMENT, OFFICE OF DIRECTOR OF LAW,
Cleveland, Ohio, for Appellants. Jaye M. Schlachet,
Cleveland, Ohio, for Appellee. **ON BRIEF:** Jennifer Sorce,
ASSISTANT DIRECTOR OF LAW, Cleveland, Ohio, for

1

Appellants.    Jaye M. Schlachet, Cleveland, Ohio, for Appellee.

WELLFORD, J., delivered the opinion of the court, in which BATCHELDER, J., joined.    DAUGHTREY, J. (pp. 19-22), delivered a separate dissenting opinion.

————————————

**OPINION**

————————————

HARRY W. WELLFORD, Circuit Judge.  Plaintiff Bertha Boyd, administratrix of the estate of decedent Adolph Boyd, Jr. ("Boyd"), filed a 42 U.S.C. § 1983 action against Cleveland police officers Matthew Baeppler and David Wilsman, police chief Rocco Pollutro, and the City of Cleveland, asserting constitutional claims arising out of the shooting death of Boyd.  The case was removed from state court to the federal district court.  Subsequently, defendants moved for summary judgment, which plaintiff opposed.  The district court denied defendants' motion for summary judgment with respect to officers Baeppler and Wilsman and reserved judgment as to defendants Pollutro and the City of Cleveland, concluding that:

> Based upon the evidence presented by plaintiff, the Court finds that genuine issues of fact exist as to whether the amount of force used by the offices was justified.
>
>  . . . A genuine issue of fact exists as to whether it was objectively reasonable to use deadly force where (1) a suspect is running away from the officers in an attempt to escape; (2) the officers did not witness the suspect fire the weapon; and (3) no verified proof exists as to whether the suspect committed a crime.

Defendants had moved for judgment on the accompanying state law claims and the district court indicated that it would not decide the state claims on their merits but would dismiss

this court of a panel "arrogating unto itself the role of resolving on appeal the factual disputes presented by a qualified immunity defense in a § 1983 action." *Scott v. Clay County*, 205 F.3d 867, 881 (6th Cir. 2000) (Clay, J., dissenting) (citing *Claybrook v. Birchwell*, 199 F.3d 350, 359-60 (6th Cir. 2000)). Because I believe that the record supports the district court's conclusion that genuine disputes remain regarding whether the defendants' conduct was reasonable, I therefore dissent.

them without prejudice "upon the resolution of the federal claims."

## I. *JURISDICTION*

Regarding this court's jurisdiction over an interlocutory appeal from a denial of summary judgment based on qualified immunity, we recently stated:

> A district court's order denying summary judgment that is based on qualified immunity and turns on an issue of law is immediately appealable as a final judgment under the collateral order doctrine. However, as this court has previously explained, "[u]nder the doctrine of *Johnson v. Jones*, [515 U.S. 304 (1995),] this court cannot review on interlocutory appeal a district court's determination that a genuine issue of fact exists for trial, but we retain jurisdiction over the legal question of qualified immunity, i.e., whether a given set of facts violates clearly established law." We review de novo the district court's denial of qualified immunity.

*Hoard v. Sizemore*, 198 F.3d 205, 211 (6th Cir. 1999) (citations omitted). Plaintiff contends we lack jurisdiction, because the district court denied summary judgment to defendants on qualified immunity upon finding "that genuine issues of fact exist" as to the use of deadly force. Defendants argue, however, that the "genuine issues of fact, found by the district court are not genuine and material, and that this appeal presents purely legal questions based on essentially uncontroverted *material* facts." Specifically, defendants assert that the district court:

> erroneously applied a fleeing felon analysis, and misidentified the governmental interest at stake in this self defense case. The facts cited by the District Court as precluding summary judgment under its erroneous analysis are not relevant to a self defense inquiry, where the government interests at stake are the lives of police officers. In this regard, Appellants [defendants] do not dispute the facts identified by the District Court as the

basis for the denial of summary judgment because those facts are not material to the relevant qualified immunity issues in this case.

We agree, and therefore, as we shall explain, we believe that the district court's assertion that there were genuine issue of material fact does not destroy the appealability of its qualified immunity ruling under the circumstances set forth.

Denial of summary judgment often includes a determination that there are controverted issues of material fact . . . and *Johnson* surely does not mean that every such denial of summary judgment is nonappealable.

\* \* \* \* \* \*

*Johnson* permits petitioner to claim on appeal that all of the conduct which the District Court deemed sufficiently supported for purposes of summary judgment met the *Harlow* [v. *Fitzgerald*, 457 U.S. 800 (1982)] standard of "objective legal reasonableness."

*Turner v. Scott*, 119 F.3d 425, 428 (6th Cir. 1997) (quoting *Behrens v. Pelletier*, 516 U.S. 299, 312, 313 (1996). We determined in *Turner* that we had jurisdiction over purely legal questions despite a district court's order stating that genuine issues of material fact existed; "[i]f it were otherwise a district court could always insulate its qualified immunity rulings from interlocutory review by mouthing the appropriate shibboleth." 199 F.3d at 428. Defendants assert that "whether Boyd had committed a crime, fired shots, or was running away are *irrelevant* to the reasonableness of both Officer Wilsman's and Office Baeppler's reactions to the threats with which they were faced." Again, we agree. The issues in this case are whether Boyd posed a threat to officers Wilsman and Baeppler and, if so, whether their use of force in response was reasonable. The district court made no finding that there remained in dispute facts material to those issues. Nonetheless, we will review the record to decide

autopsy, that, even while paralyzed, Boyd was "still fully able to move his upper extremities, including his head, arms, and torso." The plaintiff challenges this assertion with the expert testimony of Dr. Howard Tucker, whose reading of the autopsy report supported his conclusion that scapular muscles on both sides of Boyd's body and both Boyd's arms were hit by bullets, and thus "impaired from a functional standpoint." Tucker admittedly did not know if these wounds were caused by either Wilsman's or Baeppler's shots, but stated that even without the wounds to Boyd's arms and scapulae "there was severe impairment of ability to turn and with medical probability Mr. Boyd could not assume a defined posture which would signal his intent and capability to return fire" from his prone position.

The majority dismisses Dr. Tucker's testimony as based on mere probabilities, and any conclusions a jury might reach from it as mere speculation. In so doing, the majority again makes a determination as to which evidence it finds most credible, and thus again wrongfully assumes the role of factfinder. To my mind, this is a classic battle of the medical experts, the outcome of which we must leave to the jury to decide at trial. Doctors Challener and Tucker, working from the same medical data, reach contrary results as to Adolph Boyd's ability to even appear to aim a gun at the defendants from his prone position. In this case, it should be the task of the jury, and not this court, to weigh the testimony of the medical experts and determine which is more credible, and thus decide if Boyd could have presented a risk to the officers making each of Baeppler's last shots, from the first to the seventh, objectively reasonable. *Cf. Russo v. City of Cincinnati*, 953 F.2d 1036, 1047 (6th Cir. 1992) (stating, in context of qualified immunity defense to § 1983 failure to train claim, that "we do not believe the opinions of experts are to be given no weight . . . . [r]eliance on expert testimony is particularly appropriate where, as here, the conclusions rest directly upon the expert's review of materials provided by the City itself").

Today the majority holds otherwise, and its decision continues the unfortunate trend noted by other members of

brandish a weapon during their meeting. Were Boyd alive to supplement the trace evidence with his version of events, I imagine we would be more likely to find genuine issues of material fact as to whether *any* use of deadly force by either Wilsman or Baeppler was objectively reasonable.

Even were I to join my colleagues in assuming the truth of the defendants' version of their initial interaction with Adolph Boyd, I could not join their reversal of the district court's decision as to officer Baeppler. I reach this conclusion after reviewing carefully the sequence of the alleged series of interactions between Boyd and the officers. According to the defendants, as Boyd approached them officer Baeppler ordered him to freeze; instead of stopping, however, Boyd ran across Buckeye Road and into a driveway. While Boyd ran, he pointed his gun at Baeppler, who then fired three or four rounds of ammunition at Boyd. Boyd continued running away from the officers and then brought his right arm and hand across his chest and under his left armpit and pointed his weapon at Wilsman. Wilsman then fired one round of ammunition from his shotgun, which caused Boyd to fall to the ground. The autopsy report on Boyd's death stated that one pellet from this shotgun blast lodged at Adolph Boyd's T9 vertebrae; according to Cuyahoga County coroner Dr. Robert Challener, this pellet caused immediate paralysis of Boyd's lower extremities.

The defendants then claim that, after Boyd fell with his stomach and face to the ground and while the officers approached him, Boyd pulled his upper torso up from the ground and brought his right hand, still holding the weapon, across his shoulders and pointed it at Officer Wilsman, twisting to the left to do so. At that point, Officer Baeppler fired his weapon at Boyd *seven* more times until Boyd finally fully collapsed.

Defendant Baeppler claims that Boyd's continued movement while paralyzed on the ground, including the twisting of his upper torso and continued display of his firearm, made shooting Boyd seven times an objectively reasonable use of force in self defense. Baeppler supports this assertion with Dr. Challener's testimony, based on the

whether, as plaintiff maintains, we lack jurisdiction under the district court's decision, or otherwise, as defendants assert.

Witness, Steve J. Arvai, submitted an affidavit stating that on April 14, 1997, around 11:10 or 11:15 p.m., he heard a gunshot from his home and looked out the window and saw a black male armed and walking west on Buckeye near East 122nd. Arvai stated that the male was about six feet tall, wore a dark blue jacket, blue jeans and white tennis shoes and appeared to be holding a dark colored automatic. Arvai added that he saw the man point the gun at three people outside of Wendy's but that he then lost sight of him.[1]  In any event, Arvai promptly called the police operator and reported his observations. This evidence was undisputed.

Defendant police officers Baeppler and Wilsman submitted affidavits to the effect that on the night in question, they were on duty together, Baeppler driving the police car, and that shortly after Arvai's call, they were called to respond to a "Code One" emergency radio dispatch which indicated that there was a male with a gun in the area of East 120th and Buckeye Road, who met the general description given by Arvai. Defendants proceeded to the area and Wilsman notified radio headquarters of their arrival. As they approached East 119th and Buckeye, Baeppler and Wilsman "heard a broadcast from Officer Zbikowski that he had just seen the male, that the male was armed with a gun, and that the male was running towards us."

There is no dispute but that this was the information furnished these two defendant officers: a dangerous and emergency situation on Cleveland public streets at a time near midnight involving an armed man who had reportedly fired shots, potentially endangering others in the area.

---

[1] A later police check of that area's "curb, gutter, and sidewalk for possible shell casing" met with negative results. A street sweeper did go up Buckeye Road right after this incident and may have destroyed any evidence that was in the street at this location.

Baeppler and Wilsman testified that they then saw Boyd, who sufficiently met the description given them and was in the immediate area reported, running *toward* them with a gun in hand. Baeppler stopped the marked police car in the intersection of Buckeye Road and East 119th Street, and both exited with their weapons drawn, Wilsman with a shotgun. Both officers testified that they ordered Boyd to stop and identified themselves as police, although it seems clear to us that this should have been obvious to anyone present at the time.

Cleveland police officers Zbikowski and Nabowski, who also arrived on the scene pursuant to the police broadcast, testified that at Buckeye and East 120th Street they saw a person matching the description given of the suspect walking west on Buckeye and into a parking lot and that he was armed with a gun. Zbikowski added that the suspect ran down Buckeye and that he reported his information on his car radio. Both of these officers also drew their weapons when they observed the suspect at close range.

Boyd did not stop, as ordered, nor did he drop the gun which had been observed in his hand by a disinterested witness and by four different police officers at close range. We do not deem it to be a genuine issue of disputed fact that Boyd was the suspect so observed and that he was armed. We therefore do not give credence to Boyd's counsel's contention that since forensic testing after Boyd's death was either inconclusive or negative as to whether Boyd had held or fired a weapon, a genuine issue remained regarding whether Boyd had carried, pointed, or fired the gun that five persons testified that he held in his hand when they observed him that

———————————

**DISSENT**

———————————

MARTHA CRAIG DAUGHTREY, Circuit Judge, dissenting. The majority awards summary judgment to officers Baeppler and Wilsman because it finds, as a matter of law, that Adolph Boyd posed a threat to their safety that made the use of deadly force objectively reasonable. In so doing, the majority discounts the plaintiff's evidence suggesting the existence of genuine issues of material fact that should, under *Johnson v. Jones*, 515 U.S. 304 (1995), preclude our assertion of jurisdiction here. Because I believe that our court lacks jurisdiction to decide this appeal, at the very least as to defendant Baeppler, and therefore that our decision today preempts the jury's role in deciding the sufficiency of the plaintiff's evidence, *see Behrens v. Pelletier*, 516 U.S. 299, 313 (1996), I must respectfully dissent.

In some sense, the majority's analysis of the immediate circumstances of Adolph Boyd's death necessarily makes a determination as to the credibility of Baeppler and Wilsman, the only surviving eyewitnesses to the events, something the law of this court forbids us to do while deciding a summary judgment motion. *See*, *e.g.*, *Cain v. Nesbitt*, 156 F.3d 669, 672 (6th Cir. 1998). The majority accepts the officers' rendition of their interactions with Boyd as fact: that Boyd ran toward them and then away from them, that he was carrying a gun while he ran, and that he pointed the gun towards them while running. Adolph Boyd is, of course, unable to contest the truth of these highlighted facts; the plaintiff here, Bertha Boyd, presents an alternate scenario, one that necessarily lacks the specificity Adolph's testimony would have lent his case. The plaintiff's counternarrative clearly states one fact, however: that Adolph Boyd was not carrying a gun. She supports this assertion with trace evidence collected by the Cuyahoga County Coroner's Office that is inconsistent with his carrying a gun the night of April 14. No one other than the defendants saw Adolph

plaintiff's version of events. There was no conflict of expert witnesses in *Adams*. In a comparable qualified immunity situation, we stated:

> At the summary judgment stage, whether the legal violation alleged was clearly established at the time of the incident, as well as whether a genuine issue of material fact exists as to whether the alleged violation occurred, are questions of law for the court.

*Russo v. City of Cincinnati*, 953 F.2d 1036, 1043 (6th Cir. 1992) (citing *Dominque v. Telb*, 831 F.2d 673, 677 (6th Cir. 1987)).

*Behrens v. Pelletier*, 516 U.S. 299 (1996), also cited by the dissent, is certainly not controlling in this case. *Behrens* stands for the proposition that defendants asserting the defense of qualified immunity are not limited to one interlocutory appeal. *See id.* We simply do not have that issue in this case. Unlike the dissent, we see no relevance to the majority opinion in *Claybrook v. Birchwell*, 199 F.3d 350 (6th Cir. 2000), in which the court granted summary judgment to defendant police officers alleged to have violated the plaintiffs' substantive due process rights, an issue clearly distinct from the one confronting us here.

Accordingly, we **REVERSE** the decision of the district court and grant the qualified immunity claims of both defendants.

fateful night.[2] The district court indicated no genuine dispute as to whether Boyd was armed.

The district court made the following brief factual findings that are pertinent at this juncture:

1. There was reported to the police that an "African-American male had allegedly fired a gun."

2. A description of the suspect was furnished, and "[t]his man turned out to be decedent Adolph Boyd."

3. "Boyd received several fatal shots that effectuated his death."

4. Officer Wilsman fired only one shot with his shotgun "that led to Boyd's death."

5. Officer Baeppler fired at least six additional shots, and "thirteen (13) entrance wounds were discovered."

6. The officers "assert that Boyd possessed a weapon, and he aimed or pointed the weapon in the direction of the officers." No officer witnessed "Boyd fire a weapon."

7. Baeppler and Wilsman "pursue[d] Boyd on foot," after he ignored their order to stop, and Baeppler fired the first shorts at Boyd, but it is unclear whether any of those shots hit the target.

---

[2] In plaintiff's brief, Baeppler's claim that he first saw Boyd with a black object in his hand was dismissed as "incredible." (Pl.'s Br. at 9.) Counsel speculated, we believe unfairly and without justification, that the police manufactured the contention that Boyd was armed, because the gun found at the scene was not traced to Boyd, and identifiable prints were not produced.

8.   "The shotgun blast" fired by Wilsman, who claimed that Boyd was pointing his weapon at him, wounded and felled Boyd.

The district court further conceded that "[a] fact is 'material' only if its resolution will affect the outcome of the controversy." It is put more precisely, however, in *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986):

> As to materiality, the substantive law will identify which facts are material. Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted. See generally 10A C. Wright, A. Miller, & M. Kane, Federal Practice and Procedure § 2725, pp. 93-95 (1983). This materiality inquiry is independent of and separate from the question of the incorporation of the evidentiary standard into the summary judgment determination. That is, while the materiality determination rests on the substantive law, it is the substantive law's identification of which facts are critical and which facts are irrelevant that governs.

As we have already indicated, the issue before us in this case is not whether Boyd presented these officers with a *Tennessee v. Garner*[3] fleeing felon situation--the situation as to which the district court found that there remained genuine issues of disputed fact--but rather, whether Boyd presented an immediate threat to these officers to which they reacted with an unreasonable degree of force. We now review what the district court identified as "genuine" issues of fact to determine whether these disputed facts are material to the issues before us.

---

[3]471 U.S. 1 (1985).

extremity and axillary wounds there was severe impairment of ability to turn and *with medical probability* Mr. Boyd could not assume a defined posture which would signal his intent and capability to return fire at that point.

(Emphasis added.) In sum, Dr. Tucker made assumptions about the sequence of shots and the pathways of the bullets and concluded, not within a reasonable degree of medical certainty, but only "with probability," that a more likely scenario was that Boyd was unable to lift his torso and twist to threaten officer Wilsman a second time. Nowhere does Dr. Tucker point to any forensic evidence that proves what shot(s) rendered Boyd unable to lift and twist his torso, or at what point during the sequence of events the critical shot(s) hit Boyd.

The speculation of plaintiff's expert is not sufficient evidence to create a genuine issue of material fact. In view of the uncontroverted evidence in support of the testimony of both officers Baeppler and Wilsman, any jury conclusion to the contrary would necessarily be founded on mere speculation, not on the evidence. Therefore, we **REVERSE** the denial of summary judgment for both officers Baeppler and Wilsman and find as fact that Boyd, as perceived by reasonable police officers in the circumstances presented here, was armed and remained an imminent threat and a danger until he finally dropped his weapon after officer Baeppler fired his last shots.

In assessing the weight of expert testimony, we do not resort to a credibility determination. Rather, we conclude that the coroner's report is a clear medical statement not based upon mere probabilities. We conclude that Dr. Tucker's report, which was based upon probabilities only, was essentially a matter of speculation. *Adams v. Metiva*, 31 F.3d 375 (6th Cir. 1994), cited by the dissent, is clearly distinguishable from this case. *Adams* involved a confrontation and encounter between an unarmed person and police with several independent eyewitnesses supporting the

officer Baeppler fired seven more rounds at Boyd until Boyd dropped his weapon.

We are of the view also that the forensic evidence also supports the police officers' rendition of the event. The coroner specifically testified that he could conclude, "within a reasonable degree of medical certainty," that "the wounds Adolph Boyd sustained to his back . . . are consistent with Officers Baeppler's and Wilsman's description immediately prior to Officer Wilsman's discharge of the shotgun;" and that the pellet that caused the injury to Boyd's spinal cord "caused immediate paralysis of the lower extremities only. He was still *fully able* to move his upper extremities, including his head, arms and torso." (Emphasis added.) Furthermore, the state's forensic evidence plainly indicates that neither the sequence nor the exact direction of the shots could be determined by an examination of Boyd's body, and the coroner testified that the coroner's office did not undertake any type of analysis of the musculature and/or nerve damage inflicted by the shots.

The only inconsistent "evidence" relied upon by the dissent is found in the report of plaintiff's expert, Dr. Tucker, who did not examine Boyd's body, but only reviewed the state's autopsy report. This autopsy report was the sole basis for his conclusion that Boyd might not have been able to turn and point his weapon after officer Wilsman's shot landed. Dr. Tucker's opinion, however, did not definitively conclude that it would have been impossible for Boyd to raise himself up on his arms to aim his weapon again. Dr. Tucker opined, "[s]ince the entire spine from the neck to coccyx works as a unit, rational movements *are very limited* throughout the spine." (Emphasis added.) Dr. Tucker further speculated:

> Thus one can *postulate with medical probability* that both arms were impaired from a functional standpoint by bullet wounds. . . . *Admittedly we do not know* if these upper extremity and axillary bullet wounds were suffered before or after the alleged turning toward police officer. . . . However *with probability* even without these

### 1. Was Boyd running away from the officers in an attempt to escape?

At first blush, it might appear that the district court made a finding that there was a genuine issue of fact as to whether Boyd was fleeing the officers in an attempt to escape. In fact, the district court assumed that Boyd was fleeing, and this may have been what caused it to apply the *Tennessee v. Garner* analysis. However, the issue that is material here is not whether Boyd was fleeing, but whether Boyd pointed his weapon at the officers and thus posed an immediate threat to them. The district court did not address this issue at all. From what has been previously stated, it is clear that when first observed by the police officers, Boyd was running *toward* the officers, gun in hand. Each of the four officers, in response to that observation, drew his or her weapon, not in any attempt to pursue or chase Boyd but to confront a situation fraught with danger. An independent witness had reported that he heard gunshots, and then saw Boyd armed and pointing the gun at people outside a public restaurant. The police recognized Boyd as the suspect in the area in which he had been observed and in which he apparently lived.[4] The police themselves independently confirmed that Boyd was armed but none saw or heard him fire a shot. Defendants ordered Boyd to stop, identifying themselves. They testified that Boyd pointed the gun at them and ignored their commands to stop. As he moved away, Boyd allegedly continued to point the gun at the officers. At the outset, then, Boyd was not running away from the officers. As the officers confronted him, he ignored their orders and allegedly continued to point his gun at them as he attempted to flee.

### 2. Did Boyd fire the weapon?

Whether Boyd actually fired the weapon is wholly immaterial here. The issue is whether or not he threatened to do so. It was reported to the officers that Boyd had probably

---

[4]Plaintiff's brief indicates that Boyd had an apartment in the immediate area of Buckeye Road.

fired the gun and had pointed it at innocent observers at the scene when observed. They saw Boyd with gun in hand as did the independent witness. No officer testified that he or she saw Boyd fire the weapon. We deem this, however, as something other than a genuine and material issue of fact. That the defendants did not see or hear Boyd fire the weapon does not affect whether the police officers, acting reasonably under the circumstances known to them, acted in defense of their own safety and the safety of officers through the use of deadly force.

### 3.  Did Boyd commit a crime?

Again, this is wholly immaterial to the issue of whether Boyd presented a threat to officers Wilsman and Baeppler. If, indeed, Boyd fired his gun at other people or even pointed his gun at them, then he may have committed a crime. No one, however, much less the police, charged or claimed that Boyd had just committed a crime when the police confronted him. The police never purported to treat him as a fleeing felon suspect. They confronted him as a dangerous armed man who ignored their reasonable command to stop. That command obviously included the direction to stop pointing his gun at them, and this, too, was ignored.

The principal issue in *Tennessee v. Garner*, 471 U.S. 1 (1985), involved the use of deadly force by police in pursuit of an unarmed minor burglar (a "non-violent suspec[t]") was not before the court with respect to these defendants claiming qualified immunity. *Garner*, 471 U.S. at 10. *Garner* also described the suspect victim as a "nondangerous fleeing suspec[t]." *Id.* at 11. That was not the factual situation presented to the court with respect to these defendants claiming qualified immunity. The question, rather, from *Garner* is this:

> Where the officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others, it is not constitutionally unreasonable to prevent escape by using deadly force. Thus, if the suspect threatens the officer with a weapon

are overborne by objective proof that Boyd was armed, or reasonably perceived to be armed, by the police.

For the reasons indicated, we **REVERSE** the decision of the district court as to defendant Wilsman. We find him entitled to summary judgment based on qualified immunity with respect to his firing one shot from his shotgun at Boyd under the essentially uncontested material facts. We find as fact that Boyd was armed and could be considered an imminent threat and a danger to a reasonable police officer and to his partner in Wilsman's circumstances.

### III.  *LIABILITY OF BAEPPLER*

Much of our prior discussion applies to defendant Baeppler, particularly as to his initial shots that may or may not have struck Boyd. Certainly, these shots neither immobilized Boyd nor incapacitated him. Boyd remained on the loose, apparently still armed, and potentially dangerous. We concede that the question of qualified immunity as to defendant Baeppler is more difficult, especially since Baeppler fired multiple shots that contributed to bringing about Boyd's death. The question of law on this case is clear—it is about the conduct of police acting in self-defense, not about pursuit of a fleeing felon or suspect, reasonably thought to be armed and dangerous.

All of the eyewitness evidence in the record is consistent with the police officers' recitation of the events that surrounded the shooting. Unfortunately, officers Wilsman and Baeppler, and not Boyd, were the only ones available to testify about the shooting. Their statements taken during the police investigation, their deposition testimony and their affidavits all tell the same consistent story. They testified that they identified themselves as police officers and ordered Boyd to stop; Boyd continued to flee with his weapon in hand; officer Baeppler fired three to four rounds at Boyd, but Boyd responded by turning and pointing his weapon at officer Wilsman; officer Wilsman fired one shotgun blast and Boyd fell face forward onto the ground; Boyd lifted his torso and turned to point his weapon again at officer Wilsman; finally,

plaintiff, supports our view that officer Wilsman is entitled to qualified immunity for his part in the encounter in question.[5]

Our decision as to defendants and their qualified immunity is also supported by the statement from *Smith v. Freland*, 954 F.2d 343, 347 (6th Cir. 1992), that

Thus, under *Graham*, we must avoid substituting our personal notions of proper police procedure for the instantaneous decision of the officer at the scene. We must never allow the theoretical, sanitized world of our imagination to replace the dangerous and complex world that policemen face every day. What constitutes "reasonable" action may seem quite different to someone facing a possible assailant than to someone analyzing the question at leisure.

*Id*. (citing *Graham v.* Connor, 490 U.S. 386, 396-97 (1989)). See also, in a somewhat comparable situation, *Bell v. City of East Cleveland*, No. 96-3801, 1997 WL 640116 (6th Cir. Oct. 14, 1997) (unpublished). With respect to our grants of qualified immunity, contrary to assertions of the dissent, we do not base our opinion upon conflicting factual contentions or credibility determinations. The testimony of both defendant police officers is supported by objective and reasonable evidence. The eyewitness testimony of a number of persons and the broadcasts to the defendants support a conclusion that the deceased was armed, even that he had probably fired his weapon. Plaintiff's "counternarrative" in her brief that Boyd was not carrying a gun, in our view, is not based upon substantial and material evidence. *See Bell*, 1997 WL 640116. The various tests (fingerprint, residue, and firearm trace) are inconclusive under the circumstances and

---

[5] *Hopkins v. Andaya*, 958 F.2d 881 (9th Cir. 1992), also relied upon by plaintiff, involved a police encounter with an unarmed man. We do not deem it pertinent, nor do we consider *Martin v. Heideman*, 106 F.3d 1308 (6th Cir. 1997), to be relevant to the factual circumstances of this case.

---

or there is probable cause to believe that he has committed a crime involving the infliction or threatened infliction of serious physical harm, deadly force may be used if necessary to prevent escape, and if, where feasible, some warning has been given.

*Id.* at 11, 12.

We note also that in *Garner* the complaint under 42 U.S.C. § 1983 had been dismissed against the individual police officers actually involved in the shooting. *Id.* at 22. The dissent in *Garner* made special mention of "the difficult, split-second decisions police officers must make." *Id.* at 23. The case, according to the dissent, fell within "'the rubric of police conduct . . . necessarily [involving] swift action predicated upon the on-the-spot observations of the officers on the beat.'" *Id.* at 26 (quoting *Terry v. Ohio*, 392 U.S. 1, 20 (1968)). The main points that distinguish *Garner* from this case are that the suspect in *Garner* was (1) deemed to be unarmed; (2) non-violent; (3) non-dangerous; (4) a minor; and (5) the suspect did anything but confront the police.

The inquiry in § 1983 actions against a police officer for unlawful or unconstitutional use of force is an objective one based upon the "information possessed" by the police officer involved. *Anderson v. Creighton*, 483 U.S. 635, 641 (1987). It involves what a reasonable police officer would believe to be lawful based upon the information then possessed, not what the officers subjectively may have believed. *See id.* In the case before us here, the question is whether reasonable officers in the position of officers Wilsman and Baeppler would have believed that it was lawful under the circumstances to use the same degree of force used by those officers. We have already reviewed the information upon which the officers initially acted, some based upon the officers' personal observation. We view the scene and activity from the perspective, then, of the reasonable police officer at the scene based on reports and information received and what he has observed. *See Graham v. Conner*, 490 U.S.

386 (1989); *Scott v. Clay County*, ___ F.3d ___, No. 98-6157, 2000 WL 228300 (6th Cir. Mar. 1, 2000).

## II.  *LIABILITY OF WILSMAN*

Wilsman fired one shot from his shotgun which "propelled Boyd towards the ground."  No one, including plaintiff's expert, testified or contended that Wilsman's shot was the deadly force that brought about Boyd's death.  The question in Wilsman's case, then, is whether he used "a degree of force that was unreasonable under the circumstances and in violation of decedent's rights," not whether he himself was guilty of administering deadly force, and whether he acted in concert with Baeppler in administering deadly force.

In our view, from the perspective of Wilsman, based upon the information available to him and the circumstances from his viewpoint at the time he fired the single shot, we believe that he was entitled to qualified immunity, and we therefore **REVERSE** the denial of summary judgment in this regard. His contemporaneous report indicated an emergency call to the scene at about 11:30 p.m. "for a male with a gun, shooting."  Other police reported seeing the suspect "running . . . with a gun in his hand," and Wilsman then saw Boyd "running towards me . . . with a gun in his right hand." Wilsman, in uniform, yelled "stop, police," and Boyd disregarded the warning, proceeding "diagonally across Buckeye."  Wilsman "turned to run around the squad car to cut him off."  While running on this mission, Wilsman "heard a couple of shots."  He then saw Boyd "still running . . . looked back at us . . . pointed his gun . . . back at us."  As Wilsman saw it, Boyd "pointed the gun at me . . . right at my head, I could see down the barrel, and I thought I was a goner."  Wilsman then fired the shotgun at Boyd, and Boyd went down, gun still in hand.  Wilsman approached Boyd telling him to drop the gun.  Again, Boyd ignored that command.  Wilsman did not fire again, but his partner, Baeppler–threatened–fired additional shots at closer range.

Wilsman did not know when he fired at Boyd, whether the latter had fired his own pistol at them which Wilsman thought

was "a semi-automatic."  Boyd "appeared to fit the description given" Wilsman for a male "supposed to be shooting."  Wilsman's affidavit was consistent with his statement and response to questions, but it added that before he fired, he "feared for [his] own life, the life of [his] partner, and others. . . ."  Plaintiff concedes in her brief that "it is unknown whether any of Baeppler's earlier shots struck Boyd."  It was unknown to Wilsman, who heard shots, whether Baeppler, Boyd, or perhaps some one else had fired these shots. Plaintiff describes Wilsman's stated observations of Boyd's pointing his gun at him while running as incredible. (Pl.'s Br. at 12.)  Most of the plaintiff's brief, however, is directed at officer Baeppler and his actions.

We do make all reasonable and justifiable inferences in favor of plaintiff, the non-movant.  *Anderson v. Liberty Lobby*, 477 U.S. 242, 255 (1986).  This is not, however, insofar as officer Wilsman is concerned, a case as to whether he used deadly force or excessive force to capture a fleeing felon, or a suspect attempting to escape.  As to Wilsman, it is a case of whether he acted reasonably in response to a dangerous, split-second encounter late at night with an armed man reported to have been shooting the gun he had in hand pointed at the officer.

Plaintiff relies upon *Russo v. City of Cincinnati*, 953 F.2d 1036 (6th Cir. 1992), but that case held that in the § 1983 claim, qualified immunity context, "plaintiff must present 'evidence sufficient to create a genuine issue as to whether the defendant in fact'" violated "clearly established law" in taking the action he did.  "Whether a genuine issue of material fact exists" is a question of law.  *Id.* at 1043.  In *Russo*, we emphasized that we must "look to the 'facts and circumstances of each particular case . . . whether the suspect pose[d] an immediate threat to the safety of the officers or others, and whether he [was] . . . attempting to evade arrest by flight.'"  *Id.* at 1044.  We believe *Ford v. Childers*, 855 F.2d 1271, 1275-76 (7th Cir. 1988) (en banc), also cited by