RENDERED:  JANUARY 16, 2026; 10:00 A.M.
NOT TO BE PUBLISHED

# Commonwealth of Kentucky

# Court of Appeals

NO. 2024-CA-1079-MR

SEMONE CARTER, INDIVIDUALLY
AND AS ADMINISTRATOR OF THE
ESTATE OF SHELBY GAZAWAY                                    APPELLANT


APPEAL FROM JEFFERSON CIRCUIT COURT
v.          HONORABLE SUSAN SCHULTZ GIBSON, JUDGE
ACTION NO. 20-CI-003643


LOUISVILLE METRO POLICE DEPARTMENT;
AND STEVE CONRAD, PATRICK NORTON,
AND ALEX DUGAN, IN THEIR INDIVIDUAL
CAPACITIES AND OFFICIAL CAPACITIES
AS POLICE OFFICERS EMPLOYED BY
THE LOUISVILLE METRO POLICE DEPARTMENT,
A SUBDIVISION OF LOUISVILLE
METRO                                                      APPELLEES


OPINION
AFFIRMING

** ** ** ** **

BEFORE:  ECKERLE, A. JONES, AND TAYLOR, JUDGES.

ECKERLE, JUDGE:  This appeal arises from the November 7, 2019, fatal shooting of Shelby Gazaway ("Gazaway") by Louisville Metropolitan Police Department ("LMPD") Officers Patrick Norton ("Norton") and Alex Dugan ("Dugan").  Due to the shooting, Appellee, Semone Carter, Individually and as Administrator of the Estate of Shelby Gazaway ("Carter"), brought a civil action in Jefferson Circuit Court against Norton, Dugan, and their supervisor, former LMPD Chief Steve Conrad ("Conrad").  Relevant to this appeal, Carter's complaint included[1] claims of: (1) battery, violations of Kentucky Revised Statute ("KRS") 503.090, excessive force, and wrongful death against Norton and Dugan for their shooting of Gazaway; and (2) negligence against Conrad for his training and supervision of Norton and Dugan.  The Circuit Court summarily dismissed these claims on immunity grounds.  Upon thorough and careful review, we affirm.

**BACKGROUND**

The dispositive issue presented in this matter is whether, viewing the evidence of record in the light most favorable to Carter, there was probable cause

---

[1] Carter also asserted claims against Appellees in their official capacities as LMPD officers and joined "the Louisville Metro Police Department, a subdivision of Louisville Metro" as an additional defendant in her action.  Further, she asserted that LMPD violated Kentucky's Open Records Act, KRS 61.870 *et seq.* The Circuit Court dismissed those claims and LMPD as a party-defendant.  While Carter named those parties as appellees herein, she presents no arguments of error relative to those parties in her appellate brief.  Thus, there are no issues concerning them that are relevant to this appeal, and those dismissals are affirmed.  *See, e.g.*, *Osborne v. Payne*, 31 S.W.3d 911, 916 (Ky. 2000) ("Any part of a judgment appealed from that is not briefed is affirmed as being confessed.").

to believe that Norton and Dugan used a degree of force against Gazaway that was not legally justified under the circumstances. That evidence, in turn, must derive from the officers' perspectives and the information available to them prior to and during their shooting of Gazaway.

On the evening of November 7, 2019, at 6:05:56 p.m., the first of many callers to 911 indicated that there was active shooting inside the Kroger supermarket located at 520 N. 35th Street in the Portland area of Louisville, Jefferson County, Kentucky. Norton and Dugan were working together nearby and heard the resulting dispatch, which stated that there were possibly two active shooters;[2] it was unknown if anyone had been injured;[3] the suspect's descriptors were "bald," "dreadlocks," "six-foot," and "African American;"[4] and a shooter – or the shooter – was further described as wearing a red jacket or hoodie.[5]

Norton and Dugan arrived outside the Kroger roughly one minute later and parked their cruiser on 35th Street, just east of the entrance. It was after dark. When they arrived, as Dugan would later testify, "an enormous amount of

---

[2] Norton Deposition ("Depo"), Record ("R.") at 626.

[3] *See* Norton body camera footage at 0:57 counter.

[4] Norton Depo, R. at 626; Norton body camera footage at 0:50-0:54 counter.

[5] Norton Depo, R. at 622-23.

people [were] running, borderline trampling out of the back door of the Kroger."[6]

While Dugan retrieved and loaded his rifle, Norton approached the store. As Norton jogged past a parked bus, up a grass embankment, and toward a brick pillar near the front entrance, a man standing on the grass nearby just outside of the Kroger got Norton's attention and repeatedly indicated that the shooter was "right there in the red coat."[7] He was referring to a lone, African-American man with a dreadlock-mohawk style of haircut who was wearing a red hoodie, holding a gun in his right hand pointed down, swinging his arm for balance as he walked, and walking away from the entrance and into the parking lot[8] – a parking lot that was mostly full and being navigated by moving vehicles and pedestrians.[9]

Norton testified that the details related above – particularly the "active shooter" description from dispatch and his own observation that the man was "nonchalantly walking" out of the Kroger entrance with a gun in hand while people were fleeing from other exits in the store – indicated to him that the man (later

---

[6] Dugan Depo, R. at 748.

[7] Norton body camera footage at 1:08-1:13 counter; *see also* Norton Depo, R. at 628 and 633.

[8] *Id.*; *see also* Kroger security footage from camera 28 – Parking Lot RT, at 6:07:33 p.m. – 6:07:38 p.m.

[9] *See* Kroger Parking Lot Tower Camera 2 at 14:00 Counter; *see also* Norton Depo, R. at 648-49 (Norton agreed that there may have been "pedestrian civilians 360 degrees around" where he was, as well as people inside the cars in the Kroger parking lot).

identified as Gazaway) posed a threat to public safety.[10]  Norton further testified that he believed at the time that the best course of action was to get Gazaway's attention before Gazaway focused on anyone else in the vicinity.[11]  What happened next was then captured by several cameras from several different angles, but the salient details were recorded on Norton's and Dugan's body cameras and two of Kroger's outdoor security cameras.[12]

Norton's body camera shows that Norton stepped slightly to the right of the brick pillar, aimed his handgun and the beam of its attached flashlight at Gazaway, and shouted "Hey! Hey!"  Gazaway, still walking at a steady, largely unbroken pace, then raised his right arm, pointed his gun toward Norton, and turned his head toward Norton.  All of this occurred in the span of less than three seconds.[13]  The camera does not show who subsequently fired the first shot – Norton stepped slightly to the left for cover behind the brick pillar after Gazaway

---

[10] *See* Norton Depo, R. at 648, 663, and 667.

[11] *Id*., R. at 670 and 707.

[12] Two other security cameras in Kroger's parking lot – the Tower Cameras – recorded the events of the shooting, but their footage was choppy and recorded from a great distance away from the incident.

[13] *See* Norton body camera footage at 1:12-1:15 counter; *see also* Norton Depo, R. at 635 ("Off to my left, there were numerous people that had exited the Kroger on the side.  And so I wanted to get Mr. Gazaway's attention on me instead of anybody else.  And so I called out to him, which I think it's, "Hey – hey," or something.  And then right – once I said that, and it had my – what's it called?  I'm sorry, tactile – the flashlight on my handgun on and once I called out to him, Mr. Gazaway turned his arm towards me with the gun, pointed it at me and then turned his head. And then in – as I said in the PIU statement, it's very difficult to say who fired first.").

raised his arm toward him, which caused his body camera to mostly record just the brick pillar and the gun in his hand for the duration of the ensuing firefight. However, the body camera showed Norton repeatedly firing[14] in Gazaway's direction and dodging back for cover behind the pillar; other shots can be heard from Dugan's rifle and Gazaway's handgun; and Dugan can be heard shouting several times for Gazaway to drop his weapon. The firefight lasted less than 30 seconds before Norton signaled: "Shots fired, one suspect down."[15] Norton remained behind the pillar for more than another minute, during which time he shouted "Hands now" in Gazaway's direction and cautioned other responders, "Hey, be careful, the suspect's still moving, he's right there by the SUV."[16] Norton did not leave the cover of the pillar until other officers who were moving toward the Kroger entrance assured him that Gazaway was no longer a threat (*i.e.*, Norton asked "Is he down?" and they responded "You're good."[17]).

The video from Dugan's body camera was mostly obstructed by the stock of his rifle, and the audio remained off until after the gunfight ended. It shows Dugan approaching Norton's position by the brick pillar after Norton had

---

[14] Sixteen casings from bullets discharged from Norton's weapon were recovered from Norton's position.

[15] *See* Norton body camera footage at 1:14-1:38 counter.

[16] *Id*. at 1:40-2:02 counter.

[17] *Id*. at 2:38-2:40 counter.

begun firing at Gazaway. Dugan then appears to fire twice in Gazaway's direction before proceeding to Norton's location behind the pillar. Dugan fired no additional shots afterward. Dugan would later testify that as he was jogging up the embankment to join Norton, he could hear bullets ricocheting off the brick and going past his head;[18] and that he fired shots at Gazaway after seeing Gazaway using a handgun and posing "a threat to myself, Officer Norton and everyone there[.]"[19]

As for the two previously mentioned security cameras from Kroger, one ("28 – Parking Lot RT") was located above and to the left of the location that Gazaway exited the store. It was pointed in the opposite direction of the brick pillar where Norton and Dugan had positioned themselves; thus, it did not record them. But it did record ten seconds of relevant footage of Gazaway. Making his way from the store toward a black SUV that was parked with its engine still running in the driving lane of the lot about 30 feet from Kroger's entrance, Gazaway can be seen taking a drag from a cigarette in his left hand and holding a gun in his right hand. In the background, vehicles are moving in the parking lot. One of the vehicles is a car in the barred driving lane parallel to the store entrance; it is perhaps 100 feet to Gazaway's immediate left, facing Gazaway, and it begins

---

[18] Dugan Depo, R. at 759.

[19] *Id.*, R. at 759-60.

backing up as he walks into the frame. Next to it is another vehicle parked in the barred driving lane; the door is open; and the driver is standing outside next to it. As Gazaway reaches the front of the SUV he is walking toward, in a fluid motion he raises his gun to his right, turns his head to the right, fires at least two shots, and continues walking outside the camera's view.[20]

The other camera ("71 – Parking Lot Right") was located above and to the right of Gazaway's exit from the store. It was pointed forward, and thus it also did not record Norton and Dugan; but it recorded over one minute of relevant footage of Gazaway. For the duration of the footage, approximately one dozen vehicles in the background, perhaps less than a hundred feet away from the SUV, are attempting to exit the parking lot. At 6:07:38 p.m., as Gazaway is walking toward the SUV, he points his gun at Norton's position and largely keeps pointing it there until 6:07:45 p.m., but lowering it and then raising it again on one occasion. The video does not clearly indicate the number of shots Gazaway fired at that time, but it captured a muzzle flash from his weapon at 6:07:43 p.m. A total of four casings from bullets discharged from Gazaway's weapon were ultimately recovered at the scene of the firefight. The brick pillar that Norton had positioned himself behind had two gouges that investigators believed were made by bullets.

---

[20] *See* 28 – Parking Lot RT footage at 6:07:32 p.m. – 6:07:43 p.m.

At 6:07:45 p.m., Gazaway stumbles and, apparently still holding his weapon,[21] turns and opens the driver's side door to the SUV. At 6:07:49, as he is attempting to enter the vehicle through the opened door, the window on the door shatters. At 6:07:50, Gazaway crouches and disappears from view behind the vehicle's open door.[22] Afterward, only Gazaway's legs are somewhat visible through the shadow of the SUV; and by 6:08:15 p.m., his legs are seen motionless lying on the ground.

As stated at the onset, Gazaway died from the shots that Norton and Dugan fired at him during this incident, and his death prompted Carter to initiate the underlying litigation. Three years of discovery ensued, disclosing the factual information set forth above. Norton, Dugan, and Conrad then moved for summary judgment based on qualified and statutory immunity. Relative to qualified immunity, Norton and Dugan argued that their use of deadly force against Gazaway under the circumstances was a discretionary aspect of their law enforcement responsibilities, and that no evidence demonstrated that they had exercised their discretion in bad faith. Relative to statutory immunity, they argued that KRS 503.050, KRS 503.070, and KRS 503.085 collectively precluded Carter's claims against them. Conrad, for his part, asserted that because Norton's and

---

[21] As noted, Dugan repeatedly shouted at Gazaway to drop his weapon. Gazaway does not appear to drop his weapon at any point in any of the footage of record.

[22] Gazaway received several bullet wounds in his back area.

Dugan's uses of deadly force against Gazaway had been justified, they had committed no torts for which he could be held derivatively liable. In a final order of May 28, 2024, the Circuit Court granted their motions. This appeal followed. Additional facts will be discussed as necessary in our analysis.

## STANDARD OF REVIEW

"The standard of review on appeal of a summary judgment is whether the trial court correctly found that there were no genuine issues as to any material fact and that the moving party was entitled to judgment as a matter of law." *Scifres v. Kraft*, 916 S.W.2d 779, 781 (Ky. App. 1996). "The record must be viewed in a light most favorable to the party opposing the motion for summary judgment and all doubts are to be resolved in his favor." *Steelvest, Inc. v. Scansteel Serv. Ctr., Inc.*, 807 S.W.2d 476, 480 (Ky. 1991). Summary judgment can only be properly granted "where the movant shows that the adverse party could not prevail under any circumstances." *Paintsville Hosp. Co. v. Rose*, 683 S.W.2d 255, 256 (Ky. 1985).

## ANALYSIS

Carter's claims against the Appellees stem from her contention that Norton and Dugan committed common law battery against Gazaway when they shot and ultimately killed him. The tort of battery is defined as "any unlawful touching of the person of another, either by the aggressor himself, or by any

-10-

substance set in motion by him[.]" *Vitale v. Henchey*, 24 S.W.3d 651, 657 (Ky. 2000) (quoting *Sigler v. Ralph*, 417 S.W.2d 239, 241 (Ky. 1967)).  Contact is unlawful if it is unwanted or if there is no consent to it.  *See Andrew v. Begley*, 203 S.W.3d 165, 171 (Ky. App. 2006).  But an unwanted touching may be justified or privileged in certain situations.  As discussed below, a police officer is privileged to use force to effect an arrest, or in self-protection or in the protection of others.  Thus, some unwanted touching by a police officer performing his duty will be defensible against a claim of battery; and the fact that the purported battery tortfeasor is a police officer affects the proof necessary for a plaintiff's success, a defendant's defense, and the burden of going forward with evidence.

On appeal, Carter includes no argument regarding her claims that Norton and Dugan violated KRS 503.090; she has therefore waived any error relative to the Circuit Court's dismissal of those claims.  In any case, that statute was largely irrelevant because the Circuit Court did not dismiss Carter's claims on the premise that Norton and Dugan used justified force to arrest a fleeing felon or a suspect attempting to escape.  *See id*.  This case turns upon whether Norton and Dugan acted reasonably in response to a dangerous, split-second encounter, late at night, with an armed man, reported to have been shooting the gun he had in hand, pointed at the officers – all of which implicated KRS 503.085, KRS 503.050, and KRS 503.070.  In relevant part, those statutes provide:

-11-

(1) A person who uses force as permitted in KRS 503.050, 503.055, 503.070, and 503.080 is justified in using such force and is immune from criminal prosecution and civil action for the use of such force[.]

KRS 503.085.

(1) The use of physical force by a defendant upon another person is justifiable when the defendant believes that such force is necessary to protect himself against the use or imminent use of unlawful physical force by the other person.

(2) The use of deadly physical force by a defendant upon another person is justifiable under subsection (1) only when the defendant believes that such force is necessary to protect himself against death, serious physical injury[.]

. . .

(4) A person does not have a duty to retreat prior to the use of deadly physical force.

KRS 503.050.

(2) The use of deadly physical force by a defendant upon another person is justifiable when:

(a) The defendant believes that such force is necessary to protect a third person against imminent death, serious physical injury . . . ; and

(b) Under the circumstances as they actually exist, the person whom he seeks to protect would himself have been justified under KRS 503.050 and 503.060 in using such protection.

(3) A person does not have a duty to retreat if the person is in a place where he or she has a right to be.

KRS 503.070.

In *Rodgers v. Commonwealth*, 285 S.W.3d 740 (Ky. 2009), the Kentucky Supreme Court established the benchmarks for Courts to apply when addressing statutory immunity under KRS 503.085; and although the *Rodgers* framework arose from a criminal case, it is equally applicable in this context. The high Court explained: "if the defendant claims immunity the court must dismiss the case unless there is probable cause to conclude that the force used was not legally justified." *Id*. at 754. The Court further noted, "[t]he burden is on the Commonwealth[, the plaintiff in a criminal action,] to establish probable cause and it may do so by directing the court's attention to the evidence of record including witness statements, investigative letters prepared by law enforcement officers, photographs and other documents of record." *Id*. at 755.

Here, the Circuit Court held – and we agree – that the evidence of record supports only that the force used by Norton and Dugan against Gazaway was legally justified pursuant to those statutes. To review, the officers were in the process of responding to an "active shooter" notification from dispatch, one of the highest levels of deadly emergencies. Gazaway's appearance was mostly consistent with the description of at least one of the shooters given by dispatch. A bystander indicated to Norton that Gazaway was the shooter. Gazaway was

-13-

carrying a gun and walking by himself out of the Kroger while others were fleeing from other exits. It was unknown if there were casualties inside the Kroger. It was reasonable for Norton to assume that if Gazaway had opened fire inside a crowded supermarket, Gazaway might also open fire into the crowded parking lot outside of it, and that it was thus necessary to grab Gazaway's attention. Norton testified – and the video record does not refute – that when he shouted "Hey! Hey!" to Gazaway to divert his attention to himself, Gazaway responded not by immediately looking at him, but instead by immediately pointing a gun at him. Norton testified that, considering the foregoing, he believed at that moment that Gazaway was a deadly threat to himself, Dugan, and others in the vicinity. Dugan also testified that he believed that Gazaway was a deadly threat; and both officers further testified that they believed they were acting in self-defense or in the defense of others when they subsequently fired upon him.

Carter, for her part, argues that summary judgment was inappropriate because "the footage is ambiguous as to who fired first, whether [Gazaway] actually pointed his weapon at the officers, and whether he was given a fair opportunity to comply with police commands."[23] We are unpersuaded. Taking these points in reverse order, if a suspect threatens an officer with a weapon, deadly force may be used if necessary and if, where *feasible*, some warning has

---

[23] Carter Reply Br. at 3.

been given.  *See Tennessee v. Garner*, 471 U.S. 1, at 11-12, 105 S. Ct. 1694, 1701, 85 L. Ed. 2d 1 (1985).  Here, the video record indicates that after he shouted "Hey! Hey!" at Gazaway to divert Gazaway's attention from the crowded parking lot, Norton had only a split-second to react before Gazaway turned his weapon on him.

Regarding her second point, Carter provides no citation to a specific portion of any footage of record.[24]  In any case, the footage unambiguously demonstrates that Gazaway pointed his weapon at Norton, and it does not refute Norton's testimony that Gazaway did so (1) before even looking at Norton and (2) before Norton fired upon him.

Lastly, who shot first is irrelevant here.  In roughly analogous circumstances, the Federal Court of Appeals for the Sixth Circuit explained:

> Whether Boyd actually fired the weapon is wholly immaterial here.  The issue is whether or not he threatened to do so.  It was reported to the officers that Boyd had probably fired the gun and had pointed it at innocent observers at the scene when observed.  They saw Boyd with gun in hand as did the independent witness.  No officer testified that he or she saw Boyd fire the weapon.  We deem this, however, as something other than a genuine and material issue of fact.  That the defendants did not see or hear Boyd fire the weapon does not affect whether the police officers, acting reasonably under the circumstances known to them, acted in defense

---

[24] Rather than citing any specific footage of record, Carter largely cites some of Conrad's second-hand impressions of the body camera footage, which Conrad related during his deposition testimony.  Conrad was not present during the shooting incident; it is unclear which portions of the body camera footage he was shown during his deposition; and his testimony was irrelevant because the footage of record speaks for itself.

-15-

of their own safety and the safety of [others] through the use of deadly force.

*Boyd v. Baeppler*, 215 F.3d 594, 599-600 (6th Cir. 2000). We, like the Circuit Court, find *Boyd* persuasive. Thus, we agree with the Circuit Court's assessment that, under the facts of this case, Gazaway's act of brandishing and pointing a gun toward Norton was enough to establish justification for the use of deadly force by Norton and Dugan.

This conclusion also necessitates affirming the Circuit Court's determination that Norton and Dugan were entitled to qualified immunity. When a public officer or employee is civilly sued in his individual capacity as here, qualified official immunity precludes tort claims against him stemming from his negligent performance of (1) discretionary acts or functions, *i.e.*, those involving the exercise of discretion and judgment, or personal deliberation, decision, and judgment; (2) made in good faith; and (3) taken within the scope of their authority. *See Yanero v. Davis*, 65 S.W.3d 510, 522 (Ky. 2001). Relative to the first and third of those elements, the Kentucky Supreme Court has explained that the "quintessential discretionary decision of an officer alleged to have used excessive force in shooting the decedent and whether such force was reasonable 'in response to a dangerous, split-second encounter late at night with an armed man reported to have been shooting the gun he had in hand pointed at the officer'" – essentially

what occurred here – is a proper subject of qualified immunity analysis. *Sheehy v. Volentine*, 706 S.W.3d 229, 242 (Ky. 2024) (citing *Boyd*, 215 F.3d at 601).

Relative to the second element, any notion that the officers failed to act in good faith is negated by the evidence of record, which demonstrates only that Norton's and Dugan's shooting was justified. *See Yanero*, 65 S.W.3d at 523 (explaining that "bad faith can be predicated on a violation of a [causally related] constitutional, statutory, or other clearly established right which a person in [a] public employee's position presumptively would have known was afforded to a person in the plaintiff's position . . . or if the officer or employee willfully or maliciously intended to harm the plaintiff or acted with a corrupt motive.") (internal quotation marks omitted).

In short, the Circuit Court correctly dismissed Carter's battery claims against Norton and Dugan, as well as the remainder of her claims against those officers – all of which were founded upon the faulty premise that there was probable cause to believe that Norton and Dugan's shooting of Gazaway was unjustified. We also find that the Circuit Court correctly dismissed Carter's negligence claims against Conrad: absent an actionable underlying tort, there remained no basis for holding Conrad derivatively liable for Gazaway's death. We find all other arguments to be unpreserved, unpersuasive, moot, or without merit.

-17-

**CONCLUSION**

Accordingly, and for the reasons set forth above, we affirm the rulings of the Jefferson Circuit Court.

ALL CONCUR.

BRIEFS FOR APPELLANT:

David B. Mour
Gregory D. Simms
Louisville, Kentucky

BRIEF FOR APPELLEES:

Richard Elder
James E. McKeirnan, III
Assistant Jefferson County Attorneys
Louisville, Kentucky