However, the defendants contend that we should also exclude from our consideration the reasonableness of the force used in the initial firefight between the officers and Claybrook.  Yet, the plaintiffs brought suit to contest *all* use of deadly force against their deceased father, not only the shot that took his life.  Therefore, we must consider the reasonableness of force used in both the second and third segments of the evening's events.  In other words, the defendants cannot ignore the fact that shots were fired at Claybrook twice on the night in question.  In the first instance, Claybrook was fired upon by unidentified, non-uniformed officers whom Quintana Claybrook, and likely Royal Claybrook also, thought to be robbing the market.  Regardless of whether the shots fired at Royal Claybrook were warranted after he had fled to a position behind the concrete steps and aimed his gun at the officers, this initial fire fight also constitutes deadly force used against Claybrook by the officers.  Therefore, we must analyze its reasonableness to determine whether this use of force was excessive under the circumstances.[2]  Critical to the analysis of the reasonableness of the use of deadly force in this initial confrontation is the determination of who fired the first shot.  Because this fact remains in dispute at this point in the proceedings, we conclude that we do not have jurisdiction to proceed under *Johnson v. Jones*.

### CONCLUSION

For the reasons set out above, we AFFIRM the judgment of the district court denying qualified immunity to the defendants and REMAND the case for further proceedings.

---

[2] There apparently is a dispute of fact concerning whether Royal Claybrook was wounded during the initial exchange of gunfire. The plaintiffs assert in their brief on appeal that he was wounded in the stomach during this initial confrontation, but at oral argument counsel for the defendants called this assertion into question and argued, therefore, that no Fourth Amendment seizure had occurred. The record is not currently full enough to resolve this issue of fact.

RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION:  2001 FED App. 0433P (6th Cir.)
File Name:  01a0433p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

————————

| | |
|---|---|
| ROYAL E. CLAYBROOK, JR., GWANNETTE CLAYBROOK, and PETRECE CLAYBROOK, Co-Administrators of the Estate of Royal Claybrook, Sr., <br><br> *Plaintiffs-Appellees,* <br><br> v. <br><br> JESSE BIRCHWELL, STEVE LEWIS, and KEN SPENCER, <br> *Defendants-Appellants.* | No. 01-5073 |

Appeal from the United States District Court
for the Middle District of Tennessee at Nashville.
No. 96-00157—William J. Haynes, Jr., District Judge.

Argued:  September 13, 2001

Decided and Filed:  December 21, 2001

Before:  DAUGHTREY, GILMAN, and GIBSON, Circuit Judges.[*]

---

[*] The Honorable John R. Gibson, Circuit Judge of the United States Court of Appeals for the Eighth Circuit, sitting by designation.

————————————

**COUNSEL**

**ARGUED:** Francis H. Young, METROPOLITAN DEPARTMENT OF LAW, Nashville, Tennessee, for Appellant. E. E. Edwards III, EDWARDS, SIMMONS & OLIVER, Nashville, Tennessee, for Appellee. **ON BRIEF:** Francis H. Young, METROPOLITAN DEPARTMENT OF LAW, Nashville, Tennessee, for Appellant. E. E. Edwards III, EDWARDS, SIMMONS & OLIVER, Nashville, Tennessee, for Appellee.

————————————

**OPINION**

————————————

MARTHA CRAIG DAUGHTREY, Circuit Judge. The defendants, who are officers of the Metropolitan Nashville Police Department, appeal the district court's denial of summary judgment in their favor on the ground of qualified immunity in this action brought by the estate of Royal Claybrook, Sr. The plaintiffs claim that the defendants used excessive force when they shot and killed Claybrook late one night outside the F & J Market, where he stood guard holding a shotgun as his daughter-in-law, Quintana Claybrook, took the day's deposits to her car. The district court denied the defendants' motion for summary judgment, finding that genuine issues of material fact existed regarding the events surrounding Claybrook's death. The defendants argue that although disputes of fact remain in the record, they are not material to the issue of qualified immunity and that, therefore, a grant of qualified immunity is proper at this time. While we do not concur completely with the district court's analysis, we agree that there are genuine issues of material fact in this case that cannot be resolved at the summary judgment stage. We therefore affirm the district court's judgment and remand the case for further proceedings.

Here, we note, the evening's events are not so easily divided. The defendants view those events in two segments, the first extending from the officers' decision to enter the F & J Market's parking lot and confront Claybrook through the initial firefight between the officers and Claybrook, and the second beginning when Claybrook ran around the market to hide behind the concrete steps and ending with the shots that killed him. They argue that we are concerned only with the second sequence of events and must make our determination based only upon the reasonableness of the officers firing at Claybrook after he had positioned himself behind the concrete steps and pointed a gun at the officers. The defendants contend that the reasonableness of their actions in approaching Claybrook out of uniform and in an unmarked car, demanding that he drop his weapon without identifying themselves as police officers, *and opening fire on Claybrook*, are irrelevant to this analysis.

We simply disagree with their contention that the initial exchange of bullets should not weigh upon our analysis. Under the precedent of *Dickerson* and *Boyd*, we instead conclude that the evening's events are properly viewed in three segments: first, the officers' approach and confrontation of Claybrook; second, the initial firefight taking place in front of the market; and third, the shots fired after Claybrook's move to a position behind the concrete steps. Moreover, we conclude that all events taking place in the second and third segments are material to our analysis.

Although the officers' decision to approach Claybrook in the manner that they did was in clear contravention of Metro Nashville Police Department policy regarding procedures for undercover officers, under *Dickerson*, any unreasonableness of their actions at that point may not weigh in consideration of the use of excessive force. *Dickerson*, 101 F.3d at 1161-62 (*citing Drewitt v. Pratt*, 999 F.2d 774, 778 (4th Cir. 1993) (finding irrelevant to use of deadly force fact that officer had violated police procedure by failing to identify himself as an officer in stopping a suspect while dressed in plain clothes)).

to stop and identified themselves as police (though the majority notes that "it seems clear to us that this should have been obvious to anyone present at the time"). *Id.* When Boyd did not stop, the officers shot and killed Boyd. *Id.*

Analyzing the officers' use of force in segments, the court found the issues of whether Boyd was running from the officers in an attempt to escape, whether he had actually fired a shot as reported, and whether he had committed any crime to be irrelevant. *Id.* at 599-600. Rather, the majority found to be material only the facts surrounding the officers' ultimate confrontation with Boyd, including Boyd's failure to respond to their demands that he stop running and their testimony that Boyd pointed a gun at the officers in the seconds before he was shot. *Id.* at 601. Finding the officers actions to be reasonable in light of this characterization of the facts, the majority reversed the district court's denial of summary judgment to the officers on qualified immunity grounds.

The defendants here are correct in their assertion that, under *Boyd* and *Dickerson*, we must analyze the events surrounding Claybrook's death in temporal segments. However, the defendants' assertion that the holdings of these cases mandate that we look only at what occurred in the moments immediately before Claybrook was fatally shot in the head too narrowly construes the cases' holdings. The "segmenting" rules of *Boyd* and *Dickerson* divided the analysis of the use of deadly force from the analysis of possible erroneous actions taken by the officers prior to shots being fired. In *Dickerson*, this meant that the court found irrelevant to the claim of excessive force analysis whether the police officers had unlawfully failed to announce their presence in Dickerson's home prior to shots being fired. In *Boyd*, the court refrained from considering whether Boyd was, in fact, the suspect of the call to which the officers were responding and whether he had fired any shots that evening, instead limiting its analysis to the reasonableness of the officers firing at Boyd in light of their testimony that he had pointed a gun at them. In both cases, we divided prior events from those immediately preceding the use of force.

### *FACTUAL AND PROCEDURAL BACKGROUND*

This case was previously before us on appeal from the district court's dismissal under Federal Rule of Civil Procedure 12(b)(6). *See Claybrook v. Birchwell*, 199 F.3d 350 (6th Cir. 2000) (*Claybrook I*). The facts, as set out in *Claybrook I* are as follows:

On the evening of February 28, 1995, plainclothes Caucasian undercover police officers Birchwell, Lewis, and Spencer of the Nashville Crime Suppression Unit were engaged in anti-crime surveillance, from an unmarked squad vehicle, in a high-crime Nashville neighborhood. At approximately 9:11 p.m., they observed an African-American male (later identified as Royal Claybrook Sr.) standing near the street curb in the dimly-lit parking lot of the F & J Market ("the market") while displaying a long gun at port-arms. A gray Maxima automobile blocked the business' [sic] entrance. The patrolmen knew that the market had been the target of recent crimes. Suspecting that a robbery was in progress, the driver of the incognito patrol car, Officer Birchwell, in conformity with his department's standard operating procedures, radioed the police force headquarters to report the gunman's location and to request the immediate dispatch of a marked police cruiser containing uniformed law enforcers.

Birchwell then drove the undercover vehicle into the market's parking lot. He intended to stop his vehicle on what appeared to be a driveway or alleyway which abutted the building's western side, to enable the officers to surreptitiously observe the firearm-toting suspect and the suspicious gray automobile, pending arrival of the summoned marked squad car. However, Birchwell subsequently discovered that no contiguous roadway paralleled the structure's west end. Consequently, while repositioning his vehicle to prevent the armed suspect from facing the officers' backs, Birchwell maneuvered

the unidentified patrol car towards the stationary gray automobile.

That movement prompted the wary gunman to advance menacingly behind the hood of the gray Maxima while facing the intruders. Unbeknownst to the peace officers, Claybrook's daughter-in-law, Quintana Claybrook, worked at the market. Because that establishment served as a "front" for an unlawful "numbers" gambling operation, thieves occasionally targeted it. Quintana was responsible for depositing illegal betting proceeds. The associated physical danger prompted Claybrook habitually to escort Quintana, while armed, from the store to her automobile. He customarily remained in the parking lot, holding his shotgun in plain view, until Quintana had exited the area. Claybrook was acting as a security guard for his daughter-in-law on the evening of February 28, 1995. When the unmarked police vehicle arrived at the scene, Quintana was already inside the Maxima, seated behind the steering wheel with her back towards the three defendant peace constables, although each of them testified that he did not know that anyone then occupied that automobile.

Quintana testified that a passenger within the strange vehicle (the unmarked police car) ordered Claybrook to drop his weapon, to which he responded, "no, you drop your gun." She further attested:

And then the next thing I know, I heard like a firecracker sound, and then I felt something in my back, and I kind of jumped, like, you know. And I really didn't know what had happened, because, you know, I hadn't heard a gun shot, you know, before.

And then I kind of felt like I was wet, and so I kind of felt, and I was like, you know, – and then I realized that I had been shot. And I kind of leaned over in the seat, and I looked up at my father-in-law, and he looked at me. He was still standing in front of my car.

suspect, Dickerson, yelling "I've got something for your ass," the officers entered the house without knocking and announcing their presence. Upon entering the house, the officers thought they heard a gun's cylinder close. One officer moved to take a defensive position within the house; the other could not find adequate cover and ran outside. Dickerson then appeared and walked to the door of his house, at which time both officers began to fire, ultimately killing Dickerson. Upon further examination, the officers found that Dickerson's revolver had not been cocked, that no one else was in the residence, and that Dickerson had apparently been arguing with his girlfriend on the telephone. *Id*. at 1154-55.

In considering the reasonableness of the officers' actions, we segmented the claims of Dickerson's estate to consider, first, the reasonableness of the officers' actions in entering Dickerson's home without following the knock and announce rule and then, second, their use of deadly force against Dickerson. *Id*. at 1162. We limited the second inquiry to "the moments preceding the shooting" and did not allow consideration of the officers' entry into Dickerson's home to weigh in this determination. *Id*. Finding genuine issues of material fact to exist regarding the events immediately prior to the firing of shots (including "when the officers began to shoot, whether Dickerson pointed his gun at [the officers] before the officers shot him, and whether a warning was feasible"), we held that we did not have jurisdiction to consider the issue of qualified immunity under *Johnson v. Jones*. *Id*. at 1163.

We also employed a segmenting analysis in an excessive force claim in *Boyd v. Baeppler*. In that case, the defendant police officers had received a radio call that an African-American male had fired a shot, pointed a gun at three people outside a Wendy's, and fled. *Boyd*, 215 F.3d at 597. While en route to the scene of the suspect's siting, the officers received a second call that the suspect was armed and was running in their direction. *Id*. at 598. The officers then saw Boyd, who met the description of the suspect, running with a gun in his hand. The officers testified that they ordered Boyd

invoke a qualified-immunity defense, may not appeal a district court's summary judgment order insofar as that order determines whether or not the pretrial record sets forth a 'genuine' issue of fact for trial." *Id.* at 319-20. However, as we noted in a prior order in this case, "[i]f the factual disputes the district court relied on in denying summary judgment are immaterial to the legal issues raised by the appeal, this court may exercise its jurisdiction." *Claybrook v. Birchwell*, No. 01-5073 (6th Cir. Mar. 9, 2001) (unpublished order) (citing *Behrens v. Pelletier*, 516 U.S. 299, 312-13 (1996)).

As noted above, the defendants concede that there are disputed facts in the record. The most important of these is the disparity between the testimony of the officers and that of Quintana Claybrook as to whether the first shot in the initial volley of bullets was fired by one of the officers or by Claybrook. On appeal, the officers argue that this conflict in testimony is immaterial, as precedent requires that this court "carve up" an excessive force claim into a series of temporal components and consider only the reasonableness of defendants actions in the instant before they fired the shot that mortally wounded Claybrook. *See Boyd v. Baeppler*, 215 F.3d 594, 599 (6th Cir. 2000); *Dickerson v. McClellan*, 101 F.3d 1151, 1160-62 (6th Cir. 1996). We believe, however, that this view too narrowly construes the relevant circuit precedent and that, instead, we must consider the reasonableness of the defendants' actions in this case from the moment the first shot was fired.

We first adopted the practice of several of our sister circuits in analyzing excessive force claims in "segments" in *Dickerson v. McClellan* and thereby embraced a somewhat narrow interpretation of the Supreme Court's mandate that courts look to the totality of the circumstances in determining if excessive force was used. *See Dickerson*, 101 F.3d at 1161. The officers in *Dickerson* responded to a "shots fired, in progress" call, having been told that a drunken male subject had fired nine shots inside a residence. The officers proceeded to the scene without determining if anyone else was in the residence with the suspect. Arriving to hear the

And then I just–you know, I saw like–I guess it was a burst of fire or something. I don't know what it was. It was just like some fire or something. And I heard a big boom. And then I just heard a whole bunch of just fireworks and, you know. And then I heard another boom.[1] And I was like, we're getting robbed. Somebody's robbing us.

Tragically, Quintana's back had been struck by a stray bullet. She testified that she unsuccessfully attempted to telephone "911" on her cellular phone. She then called her husband, Royal Jr., to report that armed assailants were attempting to rob her and Claybrook. However, because she crouched inside her vehicle following the initial volley, she did not witness the shoot-out.

During much of the ensuing firefight, Claybrook shielded himself behind the Maxima. Rounds discharged by Claybrook struck the windshield, hood, and door of the officers' cruiser. The three police officers testified, contrary to Quintana's assertion, that Claybrook discharged his firearm at least twice before they were able to return the assailant's fire. They further asserted that, following the initial exchange of gunfire, they endeavored to identify themselves as police officers by verbalizations reinforced by manual displays of their official badges which each wore on a neck chain. Nevertheless, Claybrook continued to shoot at them. Officer Birchwell sustained gunshot wounds to his right thigh and knee and left foot. He then reported to the police dispatcher, via radio, that shots had been fired, and again requested immediate back-up assistance. At approximately that time, the suspected perpetrator fled behind the market. However, apparently rejecting the available option of escaping unharmed by means of an

---

[1] Birchwell testified that "it's very easy to distinguish a pistol shot from a shotgun. A pistol shot is sort of like a firecracker," while "a shotgun is a deep, low boom."

adjacent street, Claybrook circumambulated the structure in a bid to ambush the agents from the rear.

Claybrook concealed himself behind a slightly elevated concrete structure which afforded a dominant strategic firing posture. Each of the three officers testified that they once again warned the assailant to drop his weapon. Instead, he aimed his shotgun directly at them. The officers defensively fired at the suspect, bringing him to the ground. Approximately at that same moment, marked police units transporting uniformed officers, as well as an ambulance containing emergency medical technicians ("EMTs"), arrived at the scene. The entire incident had transpired within only one or two minutes.

Claybrook, pronounced dead at the scene, had sustained a mortal head wound. Upon discovering the seriously injured Quintana inside the Maxima, the EMTs rushed her to Vanderbilt University Hospital, where she received emergency medical attention and subsequent extended hospitalization.

*Claybrook I*, 199 F.3d at 354-55.

Plaintiffs Royal E. Claybrook, Jr., Gwannette Claybrook, and Petrece Claybrook filed suit in district court as co-administrators of Royal E. Claybrook, Sr.'s estate. Quintana Claybrook also filed suit in the same action. The plaintiffs asserted claims under 42 U.S.C. § 1983, involving violations of Royal Claybrook, Sr.'s and Quintana Claybrook's Fourth, Fifth, Sixth, Eighth and Fourteenth Amendment rights by the Metropolitan Government of Nashville and Davidson County; police officers Jesse Birchwell, Steve Lewis, and Ken Spencer; and police chief Robert Kirchner. The defendants moved for dismissal for failure to state a claim under Fed. R. Civ. P. 12(b)(6) and, in the alternative, for summary judgment. The district court granted the defendants' motions as an "alternate dismissal of the complaint for failure to state a claim and/or summary judgment adverse to the plaintiffs." *Claybrook I*, 199 F.3d at 353 n. 1. Plaintiffs appealed to this court, which affirmed the district court's dismissal of

Quintana Claybrook's claims but reversed the district court's dismissal of the claims brought on behalf of Royal Claybrook, Sr., for violation of his rights "to be free from unlawful arrest and from unreasonable and excessive use of police force, to freedom of movement, to keep and bear arms, to be free from cruel and unusual punishment, to due process of law and to equal protection of law;" and for "failure to develop policies and procedures, to properly train police conduct [sic] in undercover activities, to train with regard to the use of deadly force and to supervise and regulate adequately." *Id*. at 356.

On remand to the district court, the defendants filed a motion for summary judgment prior to trial on the grounds of qualified immunity for the officers in their individual capacities and for summary judgment on grounds of insufficient evidence as to the claims against Metro government and Chief Kirchner. The district court first found that plaintiffs had "not provided proof to sustain a judgment against the defendant Metro. As to the defendant Kirchner or Turner, his successor, both of whom are sued only in their official capacities, without proof to sustain a judgment against the defendant Metro, the Court concludes that summary judgment should be granted for the defendants Kirchner and Turner as well."

The court then granted summary judgment to defendants on all but the plaintiffs' claim that the officers violated Claybrook's right to be free from use of excessive force under the Fourth Amendment. On the officers' request for a finding of qualified immunity, the district court denied summary judgment, finding that the officers' actions were not objectively reasonable and that material issues of fact remained as to the officers' conduct. An appeal from that ruling is now before us.

### DISCUSSION

The critical issue before us on appeal is whether, under *Johnson v. Jones*, 515 U.S. 304 (1995), we have jurisdiction to consider the question of the officers' qualified immunity. Under the holding of that case, "a defendant, entitled to