**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 05a0863n.06
Filed: October 19, 2005

No. 04-6164

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

MELVIN HOWSER, AS ADMINISTRATOR OF THE
ESTATE OF JERRY LYNN HOWSER, DECEASED
    *Plaintiff-Appellee,*

          v.

CHUCK ANDERSON, INDIVIDUALLY AND IN HIS
CAPACITY AS CAPTAIN WITH THE CROSSVILLE
POLICE DEPARTMENT,
    *Defendant-Appellant*.

On Appeal from the
United States District Court for
the Middle District of Tennessee

_____/

Before: KENNEDY, COOK, and GRIFFIN, Circuit Judges

    **Kennedy, J.** This action, brought pursuant to Title 42 U.S.C. § 1983, involves a fatal shooting during the course of an arrest. Defendant Chuck Anderson appeals from the district court's denial of his motion for summary judgment based on his claim of qualified immunity. Plaintiff Melvin Howser, acting as the administrator of the estate of his brother, the decedent Jerry Lynn Howser, argues that this court lacks jurisdiction over this interlocutory appeal because the facts are in dispute and because Defendant does not concede the facts in a light most favorable to the Plaintiff. We agree that Defendant does not concede the material facts. Because material factual disputes surround the alleged constitutional violations, we lack jurisdiction over this appeal.

## BACKGROUND

This suit stems from a fatal shooting that occurred during Defendant Chuck Anderson's, ("Defendant") attempt to arrest Jerry Lynn Howser ("the decedent").[1] After a domestic dispute earlier in the day, the decedent's wife, accompanied by her minor daughter and a friend, took decedent's guns to the Crossville Police Department. Joint Appendix (J.A.) at 195-97. Shortly after arriving at the police department, the wife reported that the decedent had circled the police department in a car. *Id*. at 203. After driving by, the decedent fled and the chief of police pursued him. *Id*. at 203-04. The pursuing police were unable to stop the decedent. Sometime later, Defendant, who had taken a street parallel to the decedent and the Chief, saw the decedent hurrying along on foot. *Id*. at 210. Defendant turned his vehicle around. *Id*. at 211. The next time Defendant saw him, the decedent was stopped and speaking to the owner of a local business, a Mr. Webb. *Id*. at 212. Mr. Webb was also present at the subsequent shooting. After calling in his location to dispatch, Defendant exited his marked police car. *Id*. at 213. He testified that he did not wait for other officers to arrive and that he did not use his car's P.A. system before approaching the decedent because he was concerned that the decedent might take Mr. Webb hostage. *Id*. at 214-15.

After approaching the decedent from behind, Defendant ordered him to turn around and show him his hands. *Id.* at 215-16. He did see an object in the decedent's hand, but it did not appear to be a gun as it had cables on it. *Id*. at 216-17. Defendant ordered the decedent to lie on the ground.

---

[1] The evidence in the record consists of the depositions of Defendant; Mr. Webb, a bystander and witness; two police officers that witnessed the latter part of the struggle; Chief Beaty, the Chief of Police; a videotape from the car of one of the officers who arrived on the scene seconds before the shooting; and the reports of two expert witnesses.

2

The decedent went to his knees. *Id.* at 217-19, 539, 542. Defendant then straddled the decedent with his gun in one hand and his radio in the other. *See id*. at 226. Defendant testified that he straddled the decedent to keep the decedent on the ground. *Id*. at 224. The decedent weighed over 300 pounds. *Id*. at 231-32.

After this point, the testimony is in conflict. Some testimony indicates that in an attempt to get the decedent fully to the ground, Defendant hit the decedent in the head with his gun several times. *Id*. at 549, 566. Other testimony indicates that Defendant hit him in the region of the shoulders, neck, or head at least once. *Id*. 227-30. The Chief of Police testified that striking someone in the head with a gun could constitute deadly force if sufficient force was used in striking the blow. *Id*. at 492. There is no testimony in the record as to how hard Defendant struck the decedent. The video of the incident shows one blow, after which the decedent's head went closer to the ground for a moment. *See* Videotape (*available at* J.A. at 31).[2]

There is a dispute as to whether the decedent's hands were visible to Defendant when the decedent was struggling with him on the ground. Mr. Webb testified that there was nothing in the decedent's left hand during the struggle. J.A. at 554. Mr. Webb also opined that Defendant could see the decedent's left hand. *Id*. In addition, Mr. Webb testified that the decedent's right hand was "holding himself on the ground." *Id*. Defendant testified that, at times, he could see the decedent's left and right hands. *Id*. at 219-220. Due to the perspective at which it was filmed, the videotape is not clear as to whether the decedent's hands would have been visible to Defendant during the struggle. *See* Videotape (*available at* J.A. at 31).

---

[2]The video does not clearly show where Defendant struck the decedent. He could have struck him in the lower part of the head, the neck, or the upper back.

After struggling for a few more seconds, it appears from the video that the decedent tries to either get up or roll over onto his back or to physically confront Defendant. *See id.* During this time, decedent was shot. Mr. Webb testified that immediately after the shooting, the decedent asked Defendant why he had been shot. J.A. at 540, 546, 551. According to Mr. Webb, Defendant responded that "I thought you had a gun." *Id.* Chief Beaty, in his deposition, testified that Defendant claimed in a statement to him that he thought that the decedent had a gun. *Id.* at 490. In his deposition testimony, and in his statement to the Tennessee Bureau of Investigation made several hours after the incident, Defendant explained the shooting as an accidental weapon discharge caused by him grasping at his weapon and accidentally squeezing the trigger as he tried to steady himself and prevent himself from falling as the decedent was rising or turning. *Id.* at 65, 232. He later died at the scene.

On appeal, Defendant asserts that the District Court committed several errors in denying his motion for summary judgment on the basis of qualified immunity. First, Defendant alleges that the district court should have segmented the claims of excessive deadly force into two claims.[3] Second,

_____

[3]The district court decided that segmentation was inappropriate in this case because "the videotape reveals Defendant's use of force to have occurred in seconds and that brief time period renders segmentation inappropriate." J.A. at 171 (citing *Claybrook v. Birchwell*, 274 F.3d 1098, 1104). It is true, as the district court recognized, that segmentation is appropriate in many excessive force claims. In this case, however, because material disputes of fact exist with respect to both the striking of the decedent and the fatal shooting, segmentation would serve no useful purpose at this stage of the proceedings because a fact-finder will have to resolve factual ambiguities with respect to both the striking and the shooting. *See Claybrook*, 274 F.3d at 1104-05 (dividing the case into three segments, but holding that segments two and three were material to the analysis of the excessive force claim). *See also, e.g., Boyd v. Baeppler*, 215 F.3d 594, 599-600 (6th Cir. 2000) (segmenting the events so as to eliminate non-material facts). This circuit has also segmented claims when different constitutional violations are alleged. *See Dickerson v. McClellan*, 101 F.3d 1151, 1161-62 (6th Cir. 1996). Because both incidents here allege a use of excessive deadly force, this rationale for using segmentation is not relevant.

he argues that striking the decedent with his gun to force him to lie down was not a clearly established constitutional violation. He also argues that the district court misconstrued undisputed facts with respect to the discharge of the weapon and that there is no evidence in the record that Defendant intentionally shot the decedent. Finally, he argues that even if the shooting were intentional, applying Fourth Amendment standards, it was not clearly established that a reasonable officer would know that the shooting was unconstitutional. Consequently, Defendant argues that even if a constitutional violation did occur, the rights asserted by Plaintiff on behalf of the decedent were not clearly established so as to put Defendant on notice that his conduct towards the decedent was unconstitutional. Defendant, therefore, argues that the district court erred in not granting him summary judgment on the basis of qualified immunity. Plaintiff responds that because Defendant disputes the district court's recitation of the facts and because Defendant does not accept the facts in the light most favorable to the Plaintiff, this court should dismiss Defendant's appeal under *Johnson v. Jones*, 515 U.S. 304 (1995). Plaintiff also rejects Defendant's legal arguments on qualified immunity.

## ANALYSIS

A.     Jurisdiction

Our jurisdiction over an interlocutory appeal from a decision denying summary judgment based on qualified immunity is limited to appeals that rest on legal grounds. *Mitchell v. Forsyth*, 472 U.S. 511, 530 (1985). The Supreme Court has also determined that where genuine material factual disputes exist, a circuit court lacks jurisdiction to hear an appeal from a denial of summary judgment based on qualified immunity. *Johnson*, 515 U.S. at 313. Under *Johnson*, a Defendant seeking review of a district court's denial of qualified immunity must concede the facts most

5

favorable to the Plaintiff in order for this court to have jurisdiction over the appeal. *See also Berryman v. Reiger*, 150 F.3d 561, 562-65 (6th Cir. 1998). This court may, however, entertain an appeal if the defendant disputes the facts, but accepts them for the purposes of a legal argument on whether rights are clearly established:

> If, however, aside from the impermissible arguments regarding disputes of fact, the defendant also raises "the 'purely legal' question of 'whether the facts alleged ... support a claim of violation of clearly established law,'" *Berryman,* 150 F.3d at 562 (quoting *Mitchell,* 472 U.S. at 528 n. 9, 105 S.Ct. 2806), then there is an issue over which this court has jurisdiction. Therefore, this court can ignore the defendant's attempts to dispute the facts and nonetheless resolve the legal issue, obviating the need to dismiss the entire appeal for lack of jurisdiction.

*Estate of Carter v. City of Detroit*, 408 F.3d 305, 310 (6th Cir. 2005) (citing *Phelps v. Coy,* 286 F.3d 295, 298-99 (6th Cir.2002); *Beard v. Whitmore Lake Sch. Dist.,* 402 F.3d 598, 602 n.5 (6th Cir.2005)).

In order to determine what facts are genuine or material to the resolution of the issue and, therefore, what facts Defendant must accept for the purpose of his appeal, however, in a case such as this, this court must look at the facts in the context of the asserted constitutional violation and, for the purposes of qualified immunity, determine whether the right was clearly established with sufficient specificity prior to the violation. *Boyd v. Baeppler*, 215 F.3d 594, 599 (6th Cir. 2000) ("As to materiality, the substantive law will identify which facts are material. Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted."). *See also Brosseau v. Haugen*, ___ U.S. ___, 125 S.Ct. 596, 599 (2004) ("It is important to emphasize that this inquiry 'must be undertaken in light of the specific context of the case, not as a broad general proposition.'" (quoting *Saucier v. Katz,* 533 U.S. 194, 206 (2001)).

Qualified immunity protects government officials "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). This court in *Estate of Carter*, 408 F.3d at 310-11, identified "two steps in the analysis: (1) whether, considering the allegations in a light most favorable to the party injured, a constitutional right has been violated, and (2) whether that right was clearly established." *Id.* (citing *Saucier* 533 U.S. at 201).[4]

B.      Constitutional Violation

---

[4]As we recently indicated in *Estate of Carter*, 408 F.3d at 311:

> Panels of this court occasionally employ a three-step qualified immunity analysis, as opposed to the two-step analysis set forth here. As two recent opinions indicate, both the two-step approach and the three-step approach can be said to capture the holding of *Saucier v. Katz,* 533 U.S. 194, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001). *Compare Dunigan v. Noble,* 390 F.3d 486, 491 n. 6 (6th Cir.2004) (two-step approach), *with Sample v. Bailey,* 2005 Fed.App. 0209P, 409 F.3d 689, 696 n. 3 (6th Cir.2005) (three-step approach). The third step is "whether the plaintiff offered sufficient evidence to indicate that what the official allegedly did was objectively unreasonable in light of the clearly established constitutional rights." *Champion v. Outlook Nashville, Inc.,* 380 F.3d 893, 905 (6th Cir.2004) (internal quotation omitted). In cases subsequent to *Saucier* the Supreme Court has not formally broken up the two steps prescribed by *Saucier* into three steps, *see, e.g., Brosseau v. Haugen,* --- U.S. ----, 125 S.Ct. 596, 596, 160 L.Ed.2d 583 (2004); *Groh v. Ramirez,* 540 U.S. 551, 563, 124 S.Ct. 1284, 157 L.Ed.2d 1068 (2004), but the three-step approach may in some cases increase the clarity of the proper analysis. In many factual contexts, however, including this one, the fact that a right is "clearly established" sufficiently implies that its violation is objectively unreasonable. *Cf. Champion,* 380 F.3d at 905.

Like *Estate of Carter*, this case is one of many cases where, if the right is clearly established, the conduct is objectively unreasonable. We thus choose to collapse the second and third prongs discussed in some of our cases into one prong in this case.

The first step in the analysis requires us to evaluate whether evidence in the record, when viewed in the light most favorable to the plaintiff, would establish that a constitutional tort occurred. "[A]ll claims that law enforcement officers have used excessive force-deadly or not-in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen should be analyzed under the Fourth Amendment and its 'reasonableness' standard." *Graham v. Connor,* 490 U.S. 386, 395 (1989). The Supreme Court has held that the use of deadly force is only constitutionally reasonable if "the officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others." *Tennessee v. Garner,* 471 U.S. 1, 11 (1985). "The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham,* 490 U.S. at 396. Moreover, "[t]he calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments-in circumstances that are tense, uncertain, and rapidly evolving-about the amount of force that is necessary in a particular situation." *Id.* at 396-97.

In light of Supreme Court and Sixth Circuit jurisprudence on the matter, this court has found that deadly force is only appropriate in rare circumstances. This court has upheld the use of deadly force by a police officer when the factual situation revealed a perceived serious threat of physical harm to the officer or others in the area from the perspective of a reasonable officer. *See Boyd,* 215 F.3d at 604 (upholding qualified immunity for police officers who used deadly force against a suspect who had a gun in his hand and who pointed it at officers and others). This court has denied qualified immunity when, under the facts most favorable to the plaintiff, the defendant was not faced with a serious threat of physical harm to himself or his partner which would necessitate the use of deadly force when the plaintiff was held at gun point in a cabinet, told to exit by the defendant,

8

grabbed on to the edge of the cabinet, and was shot. *Sample v. Bailey,* 409 F.3d 689, 696 -697 (6th Cir. 2005). According to this court, "[n]othing about the movement of the plaintiff''s arm [when he started to exit the cabinet] would be threatening to a reasonable officer" even when the overall context of the incident was taken into account. *Id.*

In this case, material facts are in dispute that preclude this court from deciding whether a constitutional tort occurred, but when the facts are taken in the light most favorable to Plaintiff, the facts would establish a constitutional violation. Two distinct factual disputes are relevant to whether a constitutional tort occurred.

With respect to the shooting, Defendant argues in the alternative. Throughout much of his brief he refuses to recognize that a dispute of fact exists. *See* Def. Br. at 35-45. Rather, Defendant claims that the record, and especially the six second videotape of the shooting, permits only the conclusion that his shooting of the decedent was an accident. *See id.* at 43-45. Such a position is unsupportable in light of the testimony in the record. While Defendant's deposition testimony indicates that the shooting was an accident, Mr. Webb's testified in his deposition that immediately after the shooting, Defendant stated that he thought the decedent had a gun. Also, Defendant told Chief Beaty that he believed that the decedent had a gun. Thus, whether Defendant shot the decedent accidentally or intentionally because of Defendant's belief that the decedent had a gun is in dispute.

In addition, although Defendant testified in his deposition that he could not see the decedent's hands during portions of his struggle, and that he was unsure of why the decedent was struggling with him, other testimony in the record also indicates that the decedent's hands were visible throughout the relevant portions of the struggle. The videotape is inconclusive. Taking the

9

facts in the light most favorable to Plaintiff, if Defendant intentionally shot a struggling suspect whose hands were visible throughout the relevant portions of the struggle and who was only attempting to get up or turn over, such a use of deadly force would be excessive and would violate the decedent's Fourth Amendment rights.

With respect to Defendant's striking of the decedent with his weapon, a dispute exists as to where Defendant struck the decedent and with respect to the number of times Defendant struck the decedent. Testimony in the record indicates that Defendant hit the decedent in the head multiple times. Chief Beaty testified that a blow to the head with sufficient force could constitute deadly force. Defendant concedes that striking a suspect in the head with a pistol may constitute deadly force depending on the amount of force used and, hence, the likelihood of serious injury, but he also argues that the autopsy report reveals no head injury. Def. Br. at 36. Defendant, in his brief, relies on *Robinette v. Barnes*, 854 F.2d 909, 912 (6th Cor. 1988), where we held that whether the use of a law enforcement tool amounts to deadly force is a mixed question of law and fact and that it cannot be deadly where the injury actually inflicted is minor or non-existent. *Id.* at 912. Defendant then argues that all of the testimony, as well as the autopsy, indicates that the blow or blows were not lethal. Plaintiff argues that it was not necessary for Defendant to have gotten into a position where he could reasonably need to use the gun as a striking tool. With respect to the autopsy, Plaintiff merely states that there may be evidence developed from additional witnesses that the force used was deadly. This Court must focus on whether the force used was deadly force, not on whether it was negligent or contrary to good police practice. In light of these clear factual disputes, under *Johnson*, this court is not required to analyze all the evidence to determine if there is an issue of fact.

B.      Qualified Immunity

This court's jurisdictional analysis does not end at this stage, however. Defendant also argues, in the alternative, that the use of excessive force complained of was neither clearly established nor objectively unreasonable even if the district court assumed that Defendant shot the decedent intentionally. *See* Def. Br. at 53-66. Defendant even in so arguing, however, does not concede the most favorable facts to Plaintiff. He argues first that an "intentional use of deadly force is constitutionally permissible where officers have probable cause to believe that the suspect poses a threat of serious physical harm either to the officers or to others." *Id.* at 53. In so arguing, though, Defendant does not resolve factual ambiguities in favor of Plaintiff as he must. Implicit in his argument is the assumption that Defendant had cause to believe that, at the time of the shooting, the decedent posed a threat of serious physical harm to Defendant or the only other person present, Mr. Webb. There is evidence that Defendant was in a position to see the decedent's hands at all relevant points during the encounter including when the shot was fired. If a reasonable officer would have been able to see the decedent's hands during the entire encounter, a reasonable officer would not have had probable cause to conclude that the decedent posed a threat of serious physical harm to Defendant or to Mr. Webb.

Finally, Defendant also asks this court to assume a constitutional violation of the decedent's Fourth Amendment rights. He then asserts that "a hypothetical reasonable officer in Defendant's position could have believed that Defendant's actions were objectively reasonable under the specific facts and circumstances with which [Defendant] Anderson was confronted." *Id.* at 59. Defendant also argues that the rights asserted were not clearly established. *Id.* at 60-66.

But even this argument does not accept the facts in a light most favorable to the Plaintiff with any specificity. Defendant does not identify, specifically, how this court should interpret the facts

11

in the light most favorable to Plaintiff. He leaves that task to this court. By accepting the facts in a light most favorable to the plaintiff in such a general way he, in effect, asks the court to, on its own, identify the material facts and, when those material facts are in dispute, determine which side of the factual dispute would be most favorable to the plaintiff. Then, once the court has done that, he asks the court to evaluate his claim of qualified immunity, because only after determining the facts at issue can the court engage in the specific inquiry required by Supreme Court jurisprudence. *Brosseau*, 125 S.Ct. at 599 (quoting *Saucier*, 533 U.S. at 206).

The Supreme Court in *Johnson* cautioned appellate courts against engaging in the type of detailed analysis in interlocutory appeals. *Johnson*, 515 U.S. at 317 (limiting interlocutory appeals to "neat abstract issue[] of law.") (quoting 5A C. Wright, A. Miller, & E. Cooper, Federal Practice and Procedure § 3914.10, p. 664 (1992)). All of the considerations that the Supreme Court identified in *Johnson*, including "considerations of delay, [the] comparative expertise of trial and appellate courts, and [the] wise use of appellate resources," would be undermined if this court was obligated to undergo such an exhaustive review of the record. *Johnson*, 515 U.S. at 316.

While this court has never held, and does not hold here, that a defendant bears the burden of proof on whether he or she deserves qualified immunity, we do not believe that dismissing this appeal for want of jurisdiction transfers the burden of proof to Defendant in this case. *See Dominique v. Telb, et al.*, 831 F.2d 673, 677 (6th Cir. 1987). Here, Plaintiff has provided sufficient law that Defendant's actions, taken in a light most favorable to the Plaintiff, violated the decedent's clearly established constitutional rights. When a plaintiff makes such a showing, a defendant must either defeat that showing by distinguishing the law cited by the plaintiff, or he or she must accept that his or her case is not susceptible to dismissal on the basis of qualified immunity and proceed

12

to a trial on the merits. *See Johnson*, 515 U.S. at 313. *Cf. Berryman*, 150 F.3d at 562-65; *Sample,* 409 F.3d at 695. Here, *Garner* itself would preclude a reasonable officer from using deadly force against an arrestee whose hands are visible, since even if the officer had reason to believe the arrestee was armed, neither he nor Mr. Webb were then in immediate danger. *See, e.g., Sample*, 409 F.3d at 699-700. ("We hold that this case is "an obvious case" because it does not present a novel factual circumstance such that a police officer would be unaware of the constitutional parameters of his actions. We have held that it has been clearly established in this circuit for the law twenty years that a criminal suspect 'ha[s] a right not to be shot unless he [is] perceived to pose a threat to the pursuing officer or to others during flight.' . . . [F]actual distinctions between the cases do not alter the certainty about the law itself.") (quoting Robinson v. Bibb, 8840 F.2d 349, 351 (6th Cir. 1988)). Because Defendant cannot and does not distinguish the law cited by Plaintiff, and because he never concedes the facts in the light most favorable to Plaintiff, we lack jurisdiction over his appeal.

## CONCLUSION

For the foregoing reasons, we **DISMISS** the appeal because we lack jurisdiction to hear it.

13