NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 19a0176n.06
No. 18-3566

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

WILLIAM T. LEMMON, SR., Co-Administrator of
the Estate of William R. Lemmon,

     Plaintiff-Appellant,

v.

CITY OF AKRON, OHIO; JAMES NICE, Chief of
Akron Police, in his official capacity; BRIAN
ARMSTEAD, #1154,

     Defendant-Appellees.

)
)
)
)
)
)
)
)
)
)
)

**FILED**
Apr 04, 2019
DEBORAH S. HUNT, Clerk

ON APPEAL FROM THE
UNITED STATES DISTRICT
COURT FOR THE NORTHERN
DISTRICT OF OHIO

---

**BEFORE: KEITH, MERRITT, and LARSEN, Circuit Judges.**

**DAMON J. KEITH, Circuit Judge.** William T. Lemmon Sr. brought a 42 U.S.C. § 1983 action against Sergeant Brian Armstead for excessive force, and relatedly a *Monell v. Department of Social Services of New York*, 436 U.S. 658 (1978) action against the City of Akron and its chief of police for the officer-involved shooting death of his son William R. Lemmon. At the close of discovery, when counsel for Lemmon Sr. chose not to conduct discovery in this case, Defendants moved for summary judgment on all counts. The district court granted summary judgment on all counts, finding that Sergeant Armstead is entitled to qualified immunity because his use of deadly force was reasonable under the circumstances, and as such, dismissed the *Monell* action. Lemmon Sr. now appeals the granting of summary judgment only on the section 1983 claim for excessive force. For the foregoing reasons, we affirm.

1

## BACKGROUND

**Factual Background**

On the afternoon of September 25, 2015, William R. Lemmon ("William") became a suspect in an armed robbery of an individual inside of a grocery store located in Akron, Ohio. During the robbery, he worked with a partner who wore a black ski mask and black tee-shirt and was described as a black male. William is white and was described as 5'8" to 5'9" and possibly wearing a green tee-shirt. The store owner told the police dispatcher that "he" pointed a gun at him, but did not state whether it was William or his partner who pointed the gun. Both men fled the grocery store in a southbound direction after stealing a wallet from one of the store's patrons.

The dispatcher reported the aggravated robbery over the radio, providing the description provided by the store owner, and officers in the area began searching for the two suspects. Sergeant Brian Armstead ("Sergeant Armstead") of the City of Akron Police Department responded to the call. Sergeant Armstead heard an officer report over the radio that one of the suspects continued to head southbound and was seen jumping over a fence and leaving the area on a bicycle. While driving in the area, Sergeant Armstead saw a white male on a bicycle, and noted that he "had the same physical description as the suspect, except now he had a blue coat on and a little beanie on his head." Simultaneously, he called out over the radio to update the suspect's description, location, and which direction he traveled. It is undisputed that the suspect on the bicycle was William.

Officer Dawn Forney ("Officer Forney") also responded to the aggravated robbery report. She heard the updated description of William over the radio and proceeded to search for him, at which time William crossed an intersection on the bicycle directly in front of her. Officer Forney radioed in to verify William's description and then followed William in her car while she waited for confirmation. Sergeant Armstead also saw William riding away on a bicycle with "his hand

2

holding something at the side of his coat, almost like he was concealing something under his coat." When Officer Forney confirmed that the person she was following matched the description of the suspect in the armed robbery, she proceeded to pull William over in a nearby parking lot.

Once stopped, William stood in front of her straddling the bike. Officer Forney exited her vehicle, took cover behind her front car door, and drew her service weapon, pointing it at William. Sergeant Armstead watched Officer Forney pull William over, and parked next to her vehicle. He then exited his vehicle and stood in front of his car with his weapon drawn, about ten to fifteen feet away from William. Officer Raffaele Spano ("Officer Spano") and Officer Robert Patrick ("Officer Patrick") arrived soon thereafter to find Officer Forney and Sergeant Armstead with their weapons drawn and pointed at William in the parking lot. All four officers formed a half circle around William with their firearms drawn, except for Officer Patrick who had his taser drawn and pointed at William.

The officers commanded William to show his hands, which were at the time located on the handlebars of the bike. William exclaimed "no" and immediately placed his right hand in his front waistband. He continued to refuse the officers' orders, and shouted statements such as "shoot me," "f*ck you b**ch," "you're going to have to shoot me," and "you're going to have to kill me." In the heat of this tense standoff, William suddenly dropped his bike. Upon dropping his bike, he made a quick movement towards Sergeant Armstead, who subsequently shot William four times in rapid succession. Simultaneously, Officer Patrick fired his taser at William.

William fell to the ground, and officers moved in to secure William by removing his hand from his waistband and placing him in handcuffs. An officer on the scene performed CPR on William while an ambulance was en route to take William to the hospital. Upon securing William on the ground and removing his hand from his waistband, officers discovered William did not have

a weapon on his person. William later succumbed to his injuries. The City of Akron Police Department opened a criminal investigation into the officer-involved shooting, and submitted all evidence to the Summit County Prosecuting Attorney. Finding the shooting justified, the prosecuting attorney declined to prosecute.

**Procedural Background**

Lemmon Sr. filed this action on September 23, 2016 in the United States District Court for the Northern District of Ohio. The court filed a case management plan, which outlined various procedural deadlines, including a November 13, 2017 deadline for identifying expert witnesses. During the court's telephonic status conference held on November 1, 2017, the court noted that "[c]ounsel reported that the case is moving along in accordance with the Court's case management plan and trial order." Two days after the deadline to identify expert witnesses passed, Lemmon Sr. moved to extend the deadline to submit expert reports.[1] The court denied the motion, finding that Lemmon Sr. did not demonstrate that he exercised due diligence in attempting to meet the court's deadlines.

Defendants moved for summary judgment, and the district court granted Defendants' motion for summary judgment on all counts. Lemmon Sr. timely filed this appeal, which only challenges the denial of his excessive force claim against Officer Armstead.

## DISCUSSION

**A. Qualified Immunity**

A district court's grant of summary judgment is reviewed *de novo. Ciminillo v. Streicher*, 434 F.3d 461, 464 (6th Cir. 2006). Summary judgment is appropriate where the evidence in the record, viewed in its entirety, shows that there is no genuine issue as to any material fact and that

---

[1] At the time Lemmon Sr. filed the motion, he possessed no expert reports to submit. Instead, in the body of the motion he "respectfully move[d] [the] Court for a thirty (30) day extension of time in which to *identify experts* . . . ." R. 20 at 1, Page ID 109 (emphasis added).

the moving party is entitled to a judgment as a matter of law. *See* Fed. R. Civ. P. 56(a). "The court must assume the truth of the non-moving party's evidence, drawing all inferences in a light most favorable to that party." *Mullins v. Cyranek*, 805 F.3d 760, 765 (6th Cir. 2015). "If, in doing so, there is sufficient evidence for a trier of fact to find for the non-moving party, a genuine dispute of material fact exists." *Id.* However*,* our "duty to view the facts in a light most favorable to the nonmovant does not require or permit [us] to accept mere allegations that are not supported by factual evidence." *Chappell v. City of Cleveland*, 585 F.3d 901, 906 (6th Cir. 2009). "To make out a *genuine* issue of material fact, [the] plaintiff must present significant probative evidence tending to support her version of the facts, *evidence* on which a reasonable jury could return a verdict for her." *Id.* at 913.

Lemmon Sr. contends that Sergeant Armstead is not entitled to qualified immunity. He alleges that Sergeant Armstead's use of deadly force against William was not objectively reasonable under the Fourth Amendment because William never brandished any weapon or removed his hand from his waistband during the standoff.

The doctrine of qualified immunity insulates state actors from liability in close-call situations. *See Saucier v. Katz*, 533 U.S. 194, 206 (2001) (finding that qualified immunity is intended to protect state actors who must operate along the "hazy border" that divides acceptable from excessive force). However, qualified immunity only protects government actors performing discretionary functions from liability for civil damages when their conduct does "not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).

Once the qualified immunity defense is raised, "the plaintiff must show that (1) the defendant violated a constitutional right and (2) that right was clearly established." *McDonald v.*

*Flake*, 814 F.3d 804, 812 (6th Cir. 2016) (citing *Quigley v. Tuong Vinh Thai*, 707 F.3d 675, 680 (6th Cir. 2013)). When it is raised in a motion for summary judgment, as here, courts must weave the summary judgment standard into each step of the qualified immunity analysis. *Scott v. Harris*, 550 U.S. 372, 378 (2007).

The Supreme Court has held that the use of deadly force is proper in instances where the officer has probable cause to believe the suspect poses a threat of serious physical harm, either to the officer or to others. *Tennessee v. Garner*, 471 U.S. 1, 11 (1985). This court evaluates an officer's use of force under an "objective reasonableness" standard. *Simmonds v. Genesee Cty.*, 682 F.3d 438, 444 (6th Cir. 2012). We look at whether the officers' actions were objectively reasonable in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation. *Id.* Reasonableness is determined at the moment of the use of force, as "judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham v. Connor*, 490 U.S. 386, 396 (1989).

Our first inquiry, viewing the facts in the light most favorable to Lemmon Sr., is whether Sergeant Armstead's use of deadly force violated the Fourth Amendment's requirement of reasonableness. *Mullins*, 805 F.3d at 765 (citing *Plumhoff v. Rickard*, 572 U.S. 765, 774 (2014)).

While the ultimate determination of reasonableness must be based on the totality of the circumstances, this court has repeatedly found three factors to be helpful in excessive force cases: "(1) the severity of the crime at issue; (2) whether the suspect poses an immediate threat to the safety of the officers or others; and (3) whether the suspect is actively resisting arrest or attempting to evade arrest by flight." *Mitchell v. Schlabach*, 864 F.3d 416, 421 (6th Cir. 2017). We are cautioned not to assess those factors from a distance, but rather to consider that "police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and

rapidly evolving—about the amount of force that is necessary in a particular situation." *Mullins*, 805 F.3d at 765–66 (quoting *Graham*, 490 U.S. at 396–97). Therefore, we measure the reasonableness of the use of deadly force at a particular time based on an "objective assessment of the danger a suspect poses *at that moment.*" *Bouggess v. Mattingly*, 482 F.3d 886, 889 (6th Cir. 2007) (emphasis added).

Turning to the reasonableness factors, the severity-of-the-crime inquiry weighs in favor of Sergeant Armstead because William's crimes were severe under Ohio law. He was first reported aiding in the execution of an armed robbery. He then fled the scene of the crime, where he participated in a heated standoff with four officers. At that point, he placed his hand in his waistband in a manner that would lead a reasonable person to believe danger existed and refused to remove his hand, daring officers to shoot him. Any one of these actions can be charged under an Ohio criminal statute, and William's actions involving the robbery—whether attempted or completed, and conspiracy thereto—at minimum are third degree felonies and at maximum are first degree felonies under Ohio law. *See* Ohio Rev. Code Chapter 2911.01(C) (aggravated robbery); Ohio Rev. Code Chapter 2911.02(B) (attempted robbery); Ohio Rev. Code Chapter 2923.01(A), (J)(2) (conspiracy).

Second, William posed an immediate threat to the safety of the officers or others *at the moment of the standoff. Bouggess*, 482 F.3d at 889. Lemmon Sr. alleges the following course of events during the standoff:

> 21. As [William] was straddling his bicycle, the four Akron police officers, who were positioned in a semi-circle at a distance of ten (10) to twenty (20) feet from him, shouted multiple times and varied orders at him to raise his hands, show his hands or take his hands out of his waist band, to which [William] defiantly replied multiple expletives and said that he hadn't done anything, that he wasn't going anywhere and that the officers would have to shoot him.
>
> 22. While still straddling his bicycle, [William] put his right hand half way into the waist band of the blue jeans which he was wearing. As other officers were shouting

orders at [William], Defendant Armstead twice screamed at [William], "show your hands or I'll light you up."

23. Officer Patrick holstered his service weapon and drew his Taser. As [William], stepped off of his bicycle and allowed it to drop, Officer Patrick discharged his taser which struck [William], causing him to lurch.

R. 1, ¶¶ 21-2, Page ID at 6.

From the facts alleged by Lemmon Sr., it is clear that William did not intend to resolve the dispute peacefully. He refused to listen to officers when both of his hands were on the handlebars of the bicycle and escalated the situation when he consciously removed one hand from the handlebars and placed it in his front waistband, all while exclaiming that the officers would have to shoot him. Although officers were anywhere between ten and twenty feet away from William, Sergeant Armstead did not shoot at this point. It was not until William dropped his bicycle and stepped toward Sergeant Armstead that any force was utilized. And because William's actions suggested he possessed a firearm in his hand, William's sudden movement toward Sergeant Armstead put Sergeant Armstead in reasonable fear for the safety of himself, the surrounding officers, and bystanders.[2]

Taken together, these facts indicate that Sergeant Armstead possessed "probable cause to believe that [William] pose[d] a significant threat of death or serious physical injury" when he utilized deadly force. *Tennessee*, 471 U.S. at 3. Sergeant Armstead stated:

I thought [William] was going to run, but then he took an aggressive quick step in my direction with his hand still down at his waist, and I fired my weapon at him. . . . I feared I had to do something because [William's] behavior was way too

---

[2] Sergeant Armstead would likely still be protected by qualified immunity if we determine that he mistakenly interpreted William's step toward him as aggressive. *Mullins*, 805 F.3d at 765 (holding that "[q]ualified immunity provides police officers breathing room to make reasonable but mistaken judgments and protects all but the plainly incompetent who knowingly violate the law.") (internal quotations marks omitted). Additionally, the fact that Officer Patrick utilized his taser and not his firearm does not show that Sergeant Armstead acted unreasonably. Officer Patrick arrived to the scene *after* Sergeant Armstead and Officer Forney, and also stood further away from William. Alternatively, this difference shows that reasonable officers can disagree on how to approach the same situation. *Id*. ("In a civil suit arising from the use of deadly force, immunity should be recognized 'if officers of reasonable competence would disagree on the issue.'") (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)).

> aggressive and I was not going to allow him to draw a weapon and shoot at me or another officer.

R. 24-2, Page ID 157-58. This is the epitome of a split-second decision. William could have been attempting to flee the scene (ironically in the direction toward officers), or he could have been attempting to escalate the situation further in a myriad of harmful ways.[3] Because we will not "second-guess[] [Sergeant Armstead's] assessment, made on the scene, of the danger presented by" William, *Ryburn v. Huff*, 565 U.S. 469, 477 (2012) (per curiam), we find that the immediacy-of-the-threat factor also weighs in favor of a finding of reasonableness.

Third, it is undisputed that William was resisting arrest when he was ultimately shot. *See Ewolski v. City of Brunswick*, 287 F.3d 492, 506 (6th Cir. 2002) ("A Fourth Amendment seizure occurs when a police officer restrains the liberty of a citizen in such a way that a reasonable citizen would reasonably believe under the circumstances that he or she was not free to leave."); *see also* Compl. at ¶ 14, Page ID 5 ("At this point, [William] had been seized, as a reasonable person would no longer feel that he was free to leave."). Accordingly, the resisting arrest factor weighs in favor of a finding of reasonableness.

Each of the above factors support a finding of reasonableness. However, the ultimate question under the first prong of the qualified immunity analysis is whether Sergeant Armstead's use of deadly force against William was reasonable under the totality of the circumstances.

---

[3] The gravity of the situation is confirmed by the other officers on the scene. *See* Forney Affidavit at ¶ 7, Page ID 161 ("The suspect suddenly dropped his bike, and at that moment, I heard a gunshot or gunshots simultaneously with a taser. At the moment the suspect dropped his bike, I believed that he was going to pull a gun out, or run."); Patrick Affidavit at ¶¶ 9-10, Page ID 166 ("The suspect was holding his right hand as if he was trying to grip a pistol out of his waistband. . . . The suspect made a quick move forward towards [Sergeant] Armstead, like he was going to get off the bike. At the moment he moved forward, I fired my taser . . . ."); Spano Affidavit at ¶ 8, Page ID 164 ("I believed that the suspect may be concealing a gun because a gun was used in the robbery and this was the suspect who matched the description, and because of the suspect's refusal to obey our commands. The suspect made a motion like he was about to pull something out, and lunged towards us.").

*Mullins*, 805 F.3d at 765. We find that it was. Lemmon Sr. raises a number of concerns that we will address here.[4]

Lemmon Sr.'s main argument is that Sergeant Armstead's use of force was unreasonable because William "placed his hand in his waistband and never removed it or attempted to do so prior to being shot." Appellant Br. at 28. Although this fact is undisputed by both parties, Sergeant Armstead does not claim that he utilized deadly force against William solely because William's hand was in his waistband and William was being defiant. Instead, he claims that the totality of the circumstances, which include William being a suspect in an armed robbery, daring officers to shoot him, dropping the bike, and suddenly moving in Sergeant Armstead's direction while possibly being armed, are what ultimately caused him to fear for his life. Accordingly, Lemmon Sr. has not come forward with any evidence that rebuts the evidence in the record and has not made any showing that there is a genuine issue for trial regarding the reasonableness of Sergeant Armstead's use of force. Fed. R. Civ. P. 56(c); *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 586–87 (1986).

Instead, Lemmon Sr.'s briefs in both the district court and this court extensively focus on whether Sergeant Armstead possessed probable cause to stop William. Regardless of whether the *Terry* stop was proper, *Terry v. Ohio*, 392 U.S. 1 (1968), the events leading up to William being stopped in the parking lot are immaterial to the issue of whether Sergeant Armstead reasonably utilized deadly force during the standoff. *Livermore ex rel Rohm v. Lubelan,* 476 F.3d 397, 406–

---

[4] In addition to the concerns discussed below, Lemmon Sr. alleges facts in his briefing that are not supported by his complaint or by any evidence in the record. For instance, Lemmon claims that William was an "obviously disturbed" individual. Appellant Reply Br. at 10. He does not make this allegation in his complaint and does not attach any supporting documentation to corroborate this allegation. He also claims that William "stepped off his bike which he was instructed to do." Appellant Reply Br. at 11. Again, this fact is not included in his complaint, and is not corroborated by the record. Regardless, Sergeant Armstead interpreted William's movements as hostile and potentially deadly given the totality of the circumstances, and Lemmon Sr. admits William was defiant and not following officers' orders. As such, we disregard these statements as they are not properly included in the record or supported by evidence in the record.

07 (6th Cir. 2007) (holding that evidence of recklessness by one officer in events leading up to shooting was immaterial in evaluating objective reasonableness of the shooting officer's decision to use deadly force in the situation he faced at time of shooting); *Claybrook v. Birchwell,* 274 F.3d 1098, 1104–05 (6th Cir. 2001) (applying temporally segmented analysis to possibly erroneous actions taken by officers and finding error that preceded shooting segment to be immaterial); *Boyd v. Baeppler,* 215 F.3d 594, 599 (6th Cir. 2000) (applying segmented analysis to excessive force claim in determining which facts were material).

Lemmon Sr. claims that *Pollard v. City of Columbus*, 780 F.3d 395 (6th Cir. 2015) and *Livermore ex rel Rohm*, 476 F.3d 397 are distinguishable cases that are inappropriate to rely upon. We disagree.

In *Pollard*, Abram Bynum's ("Abram") mother brought suit under 42 U.S.C. § 1983 alleging excessive force after he was fatally shot during a standoff with police officers. *Id.* at 397. Abram was a suspect in several rape investigations, and when police officers went to Abram's home to arrest him, he fled in a car. *Id.* at 399. He led officers on a high-speed chase that eventually ended in Abram crashing his car head-on with a semi-trailer truck. *Id.* During the chase, Abram was suspected to be armed, as police officers radioed that he possessed a concealed-carry permit. *Id.* Unbeknownst to officers at the time, this radio information turned out to be incorrect, as the permit belonged to Abram's brother, who lived at the same residence. *Id.* Immediately after the crash, officers surrounded Abram's vehicle where he was momentarily unconscious. *Id.* at 400. Upon regaining consciousness, he immediately reached toward the floor as if he were searching for something. *Id.* Although officers commanded to see Abram's hands, when Abram raised his hands, he did so in a clasped position and pointed them at the officers in a "shooting posture". *Id.* At that point, officers utilized deadly force against him. *Id.* It turned out that Abram did not have

11

a weapon in the vehicle, and just gestured as if he had a gun. *Id.* The district court denied the officers qualified immunity, and this court reversed, finding that "the totality of the circumstances clearly gave the officers probable cause to believe [Abram] threatened their safety." *Id.* at 403.

In this case, Lemmon Sr. claims "*Pollard* isn't remotely similar to the present matter" because Abram clasped his hands in a shooting position and pointed them at officers, whereas William did not remove his hand from his waistband. However, the key similarity between *Pollard* and this case is the existence of probable cause to believe the felony suspects were a threat to officer and civilian safety *at the time* the officers utilized deadly force. Both Abram and William were suspects in felony crimes and were suspected to be armed before the fatal standoff. In William's case, he was involved in an armed robbery and officers did not know which of the two suspects possessed the gun. While riding his bike away from the scene, Sergeant Armstead spotted William holding something on his side.

Most importantly, both Abram and William participated in a standoff and defied officer commands to show their hands. Instead of following orders, they both mimicked hand positions that would lead a reasonable officer to believe they were reaching for a firearm. In both cases, officers did not use force to counter the reaching movement. William did more than reach for the imaginary weapon; he took an additional step. While potentially armed, William dropped his bike and moved in the direction of Sergeant Armstead, who was already in close proximity and not behind any protective cover. Similarly, although Abram did not get out of the car, he nonetheless raised his imaginary weapon and aimed it at officers who were not behind any protective cover. In both cases, officers were faced with a split-second threat of bodily harm by defiant felony suspects who gestured that they had a weapon. Accordingly, *Pollard* is analogous to the circumstances at hand.

Lemmon Sr. also seems to claim that the segmented approach that this court applied in *Livermore ex rel Rohm v. Lubelan* prohibits the court from considering the fact that William was an armed robbery suspect in our deadly force analysis. However, Lemmon Sr. conflates the court's "totality of the circumstances" analysis with his allegation that the officers created the risk of harm when they allegedly misidentified William as the robbery suspect. The court in *Livermore ex rel Rohm*, relying upon *Dickerson v. McClellan,* 101 F.3d 1151 (6th Cir. 1996), addresses Lemmon Sr.'s conflation:

> The proper approach under Sixth Circuit precedent is to view excessive force claims in segments. That is, the court should first identify the "seizure" at issue here and then examine "whether the force used to effect that seizure was reasonable in the totality of the circumstances, not whether it was reasonable for the police to create the circumstances."

*Livermore ex rel Rohm*, 476 F.3d at 406–07 (internal citations omitted). Furthermore, the *Dickerson* court reasoned:

> The time-frame is a crucial aspect of excessive force cases. Other than random attacks, all such cases begin with the decision of a police officer to do something, to help, to arrest, to inquire. If the officer had decided to do nothing, then no force would have been used. In this sense, the police officer always causes the trouble. But it is trouble which the police officer is sworn to cause, which society pays him to cause and which, if kept within constitutional limits, society praises the officer for causing.

*Dickerson,* 101 F.3d at 1161 (quoting *Plakas v. Drinski*, 19 F.3d 1143 (7th Cir.), *cert. denied*, 513 U.S. 820 (1994)). Accordingly, it is proper to attribute Sergeant Armstead's knowledge that William was a suspect in an armed robbery, and that he personally witnessed William holding something on his side, to the overall risk of bodily harm that William presented during the standoff with officers.

Next, Lemmon Sr.'s response to summary judgment relies heavily on statements taken of the officers on the scene five days following the shooting. He attempts to bring light to

discrepancies between their statements and affidavits. The parties disagree as to whether hearsay is admissible in a motion for summary judgment, and whether an exception to hearsay applies in this case. Our circuit has held that "evidence submitted in opposition to a motion for summary judgment must be admissible." *Alpert v. United States*, 481 F.3d 404, 409 (6th Cir. 2007) (quoting *U.S. Structures*, *Inc. v. J.P. Structures, Inc.*, 130 F.3d 1185, 1189 (6th Cir. 1997)). While it is debatable whether the statements here are admissible as an exception to hearsay, the admissibility of the witness statements would not affect the outcome of Sergeant Armstead's motion for summary judgment. Even if we recognized an exception to hearsay that would allow these statements into evidence, the statements would not create a genuine issue of material fact. The officers' statements corroborate Sergeant Armstead's probable cause calculus. The conveniently abbreviated statements taken from bystanders, which Lemmon Sr. has submitted, also corroborate the officers' accounts.[5] The statements are not the smoking gun Lemmon Sr. would lead the court to believe they are.

Based on the facts entered into evidence, Sergeant Armstead's use of deadly force against William during the standoff was objectively reasonable under the totality of the circumstances. Once a motion for summary judgment is supported as required under Rule 56, the non-moving party—in this case Lemmon Sr.—cannot rest solely on the allegations made in [his] pleadings but instead "must set forth by affidavits or otherwise specific facts showing that there is a genuine issue for trial." *Skousen v. Brighton High Sch.*, 305 F.3d 520, 527 (6th Cir. 2002).

Lemmon Sr. does not show that there is any issue for trial. Most of the evidence in this case is undisputed, including Lemmon Sr.'s main contention that William never removed his hand

---

[5] Lemmon Sr. attached witness statements of two bystanders that state William was behaving erratically and defying officers' orders during the standoff. He does not provide the pages of the statements that discuss the actual shooting.

from his waistband. In his complaint, Lemmon Sr. concedes that William partially matched the description of an armed robbery suspect, participated in a standoff with police officers, took a step off of the bike, ignored officer commands, and dared officers to shoot him, all while leading officers to believe he had something in his pants that potentially could have been a firearm. In response to Sergeant Armstead's motion for summary judgment, Lemmon Sr. attached the unsworn statements of the officers and witnesses present during William's standoff. Despite the debate as to whether they are admissible through an exception to hearsay, those statements corroborate the officers' affidavits and show that William was behaving in a manner that threatened the safety of everyone around him. So even if admitted, the statements would not create a genuine issue of material fact on Sergeant Armstead's use of force. The sole affidavit attached to Lemmon Sr.'s summary judgment response is an affidavit from the attorney for William's estate, who merely memorialized his transfer of the investigative file in this case over to Lemmon Sr.'s trial counsel. The evidence Lemmon Sr. relies upon is insufficient to overcome his burden on a motion for summary judgment.

Importantly, Lemmon Sr. never rebuts the declaration of Sergeant Armstead's forensic ballistics expert. *Everson v. Leis*, 556 F.3d 484, 496 (6th Cir. 2009) ("The failure to present any evidence to counter a well-supported motion for summary judgment alone is grounds for granting the motion."). Richard Ernest ("Ernest") is a third party professional forensic ballistics consultant, who was hired by the City of Akron ("the City") to perform a review of the evidence in the case and compose a report of findings. His report, which analyzes topics such as bullet trajectory and distance of shots fired, the autopsy report, officer and witness statements, *inter alia*, states that in his professional opinion "[t]he physical evidence in this case is consistent with the officer's accounts of this shooting incident." Lemmon Sr. produced no counter-evidence or counter-

arguments, and to the extent he argues that he was denied the opportunity to, the district court denied his untimely motion to retain an expert he sought "for the purposes of proof of damages." [6]

Therefore, because the undisputed record shows Sergeant Armstead had probable cause to believe that William posed a threat of serious harm, his use of deadly force was objectively reasonable under the circumstances and thus constitutionally permissible.

As for the second prong of the qualified immunity analysis, because there is no constitutional violation, we have no need to evaluate whether the law was clearly established. *See Hoover v. Walsh*, 682 F.3d 481, 501, n.57 (6th Cir. 2012) ("Because we resolve the issue of qualified immunity by concluding that there was no constitutional violation, we need not address the second prong of the analysis to determine whether Mr. Hoover's rights were clearly established.").

### B.    Spoliation Sanctions

Lemmon Sr. alleges that the City failed to preserve the only objective evidence available— Sergeant Spano's dashboard camera ("dashcam"). Lemmon Sr. argues that the district court erred as a matter of law when it denied his spoliation claim against the City in light of the fact that Sergeant Spano allegedly admitted that his dashcam was working at the time; the district court, he argues, therefore should have made a negative inference from the absence of the dashcam recording in favor of Lemmon Sr.

We review the district court's decision not to impose a spoliation sanction for abuse of discretion, giving "great deference to the district court's credibility determinations and findings of

---

[6] R. 22, Memorandum Opinion, Page ID 117 ("The Court finds that plaintiff has failed to demonstrate that he exercised diligence in attempting to meet the Court's dates and deadlines in the [Case Management Plan and Trial Order].")

fact." *Adkins v. Wolever*, 692 F.3d 499, 503 (6th Cir. 2012) (quoting *Beaven v. United States Dep't of Justice*, 622 F.3d 540, 553 (6th Cir. 2010)). "A court abuses its discretion when it commits a clear error of judgment, such as applying the incorrect legal standard, misapplying the correct legal standard, or relying upon clearly erroneous findings of fact." *Id.* (quoting *Jones v. Ill. Cent. R. Co.*, 617 F.3d 843, 850 (6th Cir. 2010)). This court in *Beaven* outlined the elements to consider when evaluating whether to grant a spoliation sanction:

> A party seeking an adverse inference instruction based on the destruction of evidence must establish (1) that the party having control over the evidence had an obligation to preserve it at the time it was destroyed; (2) that the records were destroyed "with a culpable state of mind"; and (3) that the destroyed evidence was "relevant" to the party's claim or defense such that a reasonable trier of fact could find that it would support that claim or defense. Thus, an adverse inference for evidence spoliation is appropriate if the Defendants "knew the evidence was relevant to some issue at trial and . . . [their culpable] conduct resulted in its loss or destruction." This depends on the alleged spoliator's mental state regarding any obligation to preserve evidence and the subsequent destruction.

*Beaven*, 622 F.3d at 553-54 (alterations in original) (quoting *Residential Funding Corp. v. DeGeorge Fin. Corp.*, 306 F.3d 99, 107 (2d Cir. 2002) and *Hodge v. Wal-Mart Store, Inc.*,360 F.3d 446, 450 (4th Cir. 2004)).

Upon review of the evidence in the record, the district court concluded that Lemmon Sr.'s spoliation claim failed because "he [could] not establish that *any* evidence was ever destroyed, let alone establish that any destroyed evidence was relevant to his claims." The district court stated that "Defendants have come forward with undisputed evidence that the hard drive recovered from Sergeant Spano's police vehicle, which has been preserved, did not contain any recordings or video footage of the shooting on September 25, 2015."

Lemmon Sr. reasserted his argument that Sergeant Spano explicitly mentioned the existence of a working dashcam in his initial witness statement, but that the comment is missing from his sworn affidavit. The district court held that it is possible that some of the interviews could

fall under an exception to hearsay and be deemed admissible, but it is unnecessary to reach that issue because even if the statements were to be considered, they would not create a genuine issue of material fact that would defeat summary judgment. Although Lemmon Sr. uses the issue of spoliation in an attempt to raise doubt, under the facts of this case, it would not create an issue for trial because Sergeant Armstead provided undisputed evidence that his use of force was objectively reasonable under the circumstances. An adverse inference here would not change our holding in that regard.

We note that the district court made no mention of any evidence that Sergeant Armstead had control over the allegedly destroyed dashcam. However, Lemmon Sr. never alleges that *Sergeant Armstead* had any access to Officer Spano's dashcam and also makes no argument that Sergeant Armstead would still be liable if it were established that the City destroyed the alleged video without his knowledge. *See Adkins*, 692 F.3d at 505 (affirming district court's denial of spoliation sanctions for officer when the prison lost the evidence, and the officer had no control over the evidence). There is sufficient evidence in this record to rebut Lemmon Sr.'s allegations of spoliation against both Sergeant Armstead and the City, and as noted by the district court, no evidence that any evidence was destroyed. As such, the district court's conclusion was not an abuse of discretion, and its reliance on the factual record before it was not clearly erroneous. Accordingly, we affirm its decision.

## CONCLUSION

For the foregoing reasons, we affirm the district court's grant of summary judgment against Lemmon Sr. on his § 1983 excessive force claim.